TATUM *et al. v.* WHEELESS *et al.*, UNEMPLOYMENT COMPENSATION COMMISSION.

(Division B. Jan. 10, 1938.)

[178 So. 95. No. 32936.]

Green, Green & Jackson, of Jackson, for appellants.

**John H. Holloman,** of Columbus, and J. A. Lauderdale, Assistant Attorney-General, for appellees.

**Ethridge, P. J.,** delivered the opinion of the court.

The appellants were complainants in the court below, and filed a bill herein, challenging the validity of the Mississippi Unemployment Compensation Law, chapter 176, Laws of 1936, and amendments, chapter 3 of the Special Session Laws of 1936, First Session, and the Social Security Act of the United States, 42 U. S. C. A., section 301 et seq., upon the subject of Unemployment Compensation; and for the recovery of specific taxes paid by the complainant to the defendant for the period beginning April 1, 1936, ending June 30, 1936; July 1,

1936, to September 30, 1936; and from October 1, 1936, to December 31, 1936; and for an injunction to prevent future enforcement of the acts.

The appellants, complainants below, are engaged in manufacturing timber into lumber, and have been so engaged for a number of years, employing in the conduct of their business more than 8 employees, to-wit, about 350. The bill sets out the approximate amount of wages paid to these employees, and alleges that it has a right to conduct the business, and a right to contract with employees, as it has heretofore done; that such right is property, which right the appellant is entitled to exercise without let or hindrance, under the Constitution; that it has contributed, under the National Security Act, the sum named in the bill; that the employees of appellant are of full age, competent to contract; and that "each employe must return to the operation an amount in excess of the wages by him therefrom taken; otherwise he would be a profitless servant and ultimately destroy the operation." They further allege that in making contracts of employment such contracts were satisfactory to both employer and employee; and set up many other allegations not necessary to state in full herein, but seeking to challenge the constitutional validity of the act of the Mississippi Legislature, and of the Social Security Act of the federal government, which co-operates with the Mississippi Unemployment Compensation Act in providing a fund to pay persons and employees of persons or corporations employing in excess of 8 persons.

Subsequent to the filing of the suit the United States Supreme Court decided a case in which it held that the Federal Social Security Act was constitutional, and that state acts co-operating with the Federal Social Security Act involved in its decision did not violate any provision of the Federal Constitution. See Carmichael, Atty.-Gen., v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327; Steward Ma-

chine Co. v. Davis, 301 U. S. 548, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293, and Helvering v. Davis, 301 U. S. 619, 57 S. Ct. 904, 81 L. Ed. 1307, 109 A. L. R. 1319. The appellant, in his brief, concedes that these decisions establish the constitutionality of the Mississippi Unemployment Compensation Act, in so far as any question under the Federal Constitution is concerned; but contends that the act is in conflict with a number of provisions of the Mississippi State Constitution of 1890.

The Legislature, in enacting this law, laid down certain criteria as to the policy of the state in the matter, the purpose of the law, and various provisions for the collection of funds from employers to carry out its requirements, as well as the machinery for its administration in the payment of benefits accruing thereunder. In chapter 3 of the Special Laws of 1936, First Session, amending section 2 of the original act, among the purposes stated by the Legislature is the following:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this

measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

"(b) The legislature hereby finds and declares that the existence and continued operation of a federal tax 'upon employers, against which some portion of the contributions required under this act may be credited, will protect Mississippi employers from undue disadvantages in their competition with employers in other states. If at any time, upon a formal complaint to the governor, he shall find that title IX of the social security act has been amended or repealed by congress or has been held unconstitutional by the supreme court of the United States, and that, as a result thereof, the provisions of this act requiring Mississippi employers to pay contributions will subject them to a serious competitive disadvantage in relation to employers in other states, he shall publish such findings and proclaim that the operation of the provisions of this act requiring the payment of contributions and benefits, shall be suspended for a period of not more than six months. The commission shall thereupon requisition from the unemployment trust fund all moneys therein standing to its credit, and shall direct the state treasurer to deposit such moneys, together with any other moneys in the unemployment compensation fund, as a special fund in any banks or public depositories in this state in which general funds of the state may be deposited.

"In all other cases, and unless the governor shall issue such proclamation, this act shall remain in full force and effect.

"If within the aforesaid six months' period the governor shall find that other federal legislation has been enacted which avoids the competitive disadvantage herein described, he shall forthwith publicly so proclaim, and upon the date of such proclamation, the provisions of this act requiring the payment of contributions and bene-

fits shall again become fully operative as of the date of such suspension with the same effect as if such suspension had not occurred. If within such six months' period no such other federal legislation is enacted, or the legislature of this state has not otherwise prescribed, the commission shall, under regulations prescribed by it, refund, without interest, to each employer by whom contributions have been paid his pro rata share of the total contributions paid under this act. Any interest or earnings of the fund shall be available to the commission to pay for the costs of making such refunds. When the commission shall have executed the duties herein prescribed and performed such other acts as are incidental to the termination of its duties under this act, the governor shall by public proclamation declare that the provisions of this act, in their entirety, shall cease to be operative.

"(c) If at any time the provisions of this act requiring the payment of contributions and benefits shall be held invalid under the constitution of this state by the supreme court of this state or invalid under the United States constitutions by the supreme court of the United States, the commission shall forthwith requisition from the unemployment trust fund all moneys therein standing to the credit of the commission, and shall direct the state treasurer to deposit such monies together with any other monies in the unemployment compensation fund, in any banks or public depositories in this state in which general funds of the state may be deposited. If within six months after the date of such decision, the legislature of this state enacts a new unemployment compensation law, such monies shall be paid into the unemployment compensation fund established thereunder. If within such six months' period, the legislature of this state has not enacted a new unemployment compensation law, the commission shall, under regulations prescribed by it, refund, without interest, to each employer by whom contributions have been paid, his pro rata

share of the total contributions paid under this act. Any interest or earnings of the fund shall be available to the commission to pay for the costs of making such refunds. The provisions of this act, so far as necessary to the execution by the commission of the duties prescribed in this section and to the performance of such other acts as are incidental to the termination of its duties under this act, shall remain in full force and effect until the completion thereof.

''(d) Refunds provided under subsections (b) and (c) of this section shall not be subject to any provisions of law requiring specific appropriations or other formal release by state officers of monies in their custody.''

The act provided in detail for the creation of a fund for those who should be eligible thereunder, and entitled to benefits, and for disqualifications for such benefits; under what conditions the same may be paid, how to file a claim for benefits preliminary to determination of such questions, and for appeals from decisions of the Unemployment Commission, fixing its jurisdiction, power being given courts to review such decisions under circumstances named in the act. It also provides for control of the fund, and for the investment of such part thereof as is not needed at any time; and for the withdrawal of such funds to fulfil the purposes of the act, and that the funds shall be used exclusively for the purposes of the act; and that the payment of benefits shall be made in accordance with rules prescribed by the commission, consistent with the provisions of this act. The state treasurer is made ex officio treasurer and custodian of the fund, which he shall administer in accordance with the provisions of the act, under the directions of the commission, and shall pay all warrants drawn upon it in accordance with such rules as the commission may prescribe. It is provided that all contributions, upon receipt thereof by the commission, shall be forwarded to the treasurer, who shall immediately deposit them, together with all moneys earned thereby while in his cus-

tody, and any other moneys received by him, in the clearing account; all moneys other than those required for current needs in administering the Unemployment Trust Fund shall be deposited with the Secretary of the Treasury of the United States of America, to the credit of this state, in the Unemployment Trust Fund, established and maintained pursuant to section 904 of the Social Security Act, as amended, 42 U. S. C. A., section 1104, any provisions of law in this state relating to the deposit, administration, release, or disbursement of moneys in the custody of the state, or moneys deposited in any fund created by the state, to the contrary notwithstanding. All moneys belonging to the compensation fund, and not otherwise deposited, invested, or paid over pursuant to the provisions of this act, may be deposited by the treasurer under the direction of the commission in any banks or public depositories in which the general funds of the state may be deposited; but no public deposit insurance, charge, or premium shall be paid out of the fund. The treasurer shall give a separate bond conditioned upon the faithful performance of the duties of custodian of this fund in an amount to be fixed by the commission, in a form prescribed by law and approved by the Attorney-General.

It is provided in subsection (e) of section 9, chapter 176, Laws of 1936, that the provisions of subsections (a), (b), (c) and (d), to the extent that they relate to the Unemployment Trust Fund, shall be operative only so long as such fund continues to exist, and so long as the Secretary of the Treasury of the United States of America continues to maintain for this state a separate book account of all funds deposited therein by this state for benefit purposes, together with this state's proportionate share of the earnings of such fund, from which no other state is permitted to make withdrawals. If and when such Unemployment Trust Fund ceases to exist, or such separate book account is no longer maintained, all moneys, properties, or securities therein belonging to

the Unemployment Compensation Fund of this state shall be transferred to the treasurer of the Unemployment Compensation Fund, who shall hold, invest, transfer, sell, deposit, and release such moneys, properties, or securities in a manner approved by the commission, in accordance with the provisions of this act, provided that such moneys shall be invested in the following readily marketable classes of securities: Bonds or other interest-bearing obligations of the United States of America, the state of Mississippi, and of any county, consolidated school district, road bonds, municipal bonds of counties, cities and towns of Mississippi, Federal Land Bank bonds, Home Owners' Loan Corporation bonds, Yazoo & Mississippi Delta Levee District bonds, Mississippi Levee District bonds, municipal bonds of cities with a population of 100,000 and over, located in the states of Louisiana, Texas, Arkansas, Alabama, Georgia, Florida, and Tennessee; and provided further that such investment shall at all times be so made that all the assets of the fund shall always be readily convertible into cash when needed for the payment of benefits. The treasurer shall dispose of securities or other properties belonging to the Unemployment Compensation Fund only under the direction of the commission.

The act requires the commission to establish a state employment service in various parts of the state, to serve applicants for employment free of charge. The provisions of the act create a fund solely for the benefit of persons employed in concerns that engage more than 8 employees; and except therefrom agricultural, and some other, occupations. The act also provides security against idleness and loafing, and benefits do not accrue ordinarily until there has been a period of unemployment for at least two weeks; and those who do not take suitable employment when tendered to them, with the approval of the commission, shall cease to be entitled to the benefits under the act.

It is urged that the state of Mississippi is sovereign

within its sphere, a member of an indissoluble Union, with plenary power over employment exclusive of national authority thereas to; but by the Federal Social Security Act this sovereignty is impaired and subordinated. In other words, it is urged that the act is a coercion by the federal government of the state in a matter in which the state has full and complete jurisdiction, and that state sovereignty is surrendered, under the Mississippi law, to the exactions of the federal government. The federal act gives the federal taxpayer credit, on his federal tax, of all tax paid to the state up to 90 per cent. of the federal tax, if the state has an unemployment insurance system. If not, this amount is paid to the federal government, and used in other states having an unemployment insurance system.

In Carmichael v. Southern Coal & Coke Co., supra, 301 U. S. 495, 57 S. Ct. 868, 880, 81 L. Ed. 1245, 109 A. L. R. 1327, the Supreme Court of the United States, in dealing with this contention on the part of this company, said:

"There remain for consideration the contentions that the state act is invalid because its enactment was coerced by the adoption of the Social Security Act, and that it involves an unconstitutional surrender of state power. Even though it be assumed that the exercise of a sovereign power by a state, in other respects valid, may be rendered invalid because of the coercive effect of a federal statute enacted in the exercise of a power granted to the national government, such coercion is lacking here. It is unnecessary to repeat now those considerations which have led to our decision in the Chas. C. Steward Machine Co. Case, that the Social Security Act has no such coercive effect. As the Social Security Act is not coercive in its operation, the Unemployment Compensation Act cannot be set aside as an unconstitutional product of coercion. The United States and the State of Alabama are not alien governments. They coexist within the same territory. Unemployment within it is their

common concern. Together the two statutes now before us embody a cooperative legislative effort by state and national governments for carrying out a public purpose common to both, which neither could fully achieve without the cooperation of the other. The Constitution does not prohibit such cooperation.

''As the state legislation is not the product of a prohibited coercion, there is little else to which appellees can point as indicating a surrender of state sovereignty. As the opinion in the Chas. C. Steward Machine Co. Case points out, full liberty of action is secured to the state by both statutes. The unemployment compensation fund is administered in accordance with state law by the state commission. The statute may be repealed at the will of the legislature, and in that case the state will be free to withdraw at any time its unexpended share of the Unemployment Trust Fund from the Treasury of the United States, and to use it for any public purpose.''

This decision, and the other decisions cited, establish fully the meaning of the federal statute, and that that statute does not coerce the states, and that the states are free to repeal the state law, and to withdraw their funds, at any time they see proper to do so. In other words, the decision establishes the freedom of the state to have, or not to have, an unemployment fund, and to withdraw from the federal Treasury its funds and securities at will, so far as any federal power is concerned. It establishes that the relation between the federal and state governments is a co-operative plan for dealing with unemployment, realizing that it is a problem that concerns each government; and, as stated in the opinion, one with which neither government alone can deal effectively.

In the argument we are directed to the dissenting opinions by some of the justices of the Supreme Court of the United States, in these cases cited, in whose opinion statutes of this kind violate state sovereignty and are coercive in their nature. While we are free in the

construction of our own statutes and Constitution to interpret it in accordance with our own views, and are not bound by a federal court decision as to the meaning or constitutionality of a state statute, so far as the State Constitution and statutes are concerned, we adhere to the position that the state is sovereign over matters confided to it, or reserved to it, by the Tenth Amendment to the Federal Constitution; and we recognize the fact that state sovereignty cannot be bargained away or surrendered by the state Legislature. Yet we believe that unemployment is a problem over which both federal and state governments have some jurisdiction, and each may provide suitable laws to mitigate unemployment, or to prevent it. In this nation there is more migration from one section to another than in days past; the unemployed in one state may freely go into another state of the Union to secure employment or to do business; and, in fact, conditions in recent years have tended to develop this movement from place to place, seeking employment, or for other reasons. The unemployed in one state, hearing of a field where labor is needed, or where the unemployed can be cared for, are apt to go there, often destitute or without adequate means of support. In many instances they become a burden upon the community and state where they had not previously lived or been employed, thus constituting a group which affects the ability of others in such community to secure employment, as well as the wage scale, because an excess in the number of those seeking employment has a tendency to depress the wages paid, since the most necessitous, in order to secure employment and a livelihood, will accept the minimum wage.

We see no infringement, in any provision of the act of the Legislature, of the sovereign powers retained by the state, and which are recited in the sixth section of the State Constitution, declaring that the state has sole and exclusive power and jurisdiction over its affairs. We think it prevents the Legislature from surrendering

such power to the national, or any other, government. This does not prevent co-operation between the state and federal governments, where each acts within its appropriate sphere, and may at any time reassert its full control over the subject-matter of the agreement. The Federal Constitution recognizes the right of the state to negotiate with the federal government, and to make treaties or arrangements with other states of the Union affecting in some respect their respective powers, provided it is done with the consent of the Congress, given in an appropriate manner. The federal government, having delegated powers, and only such as are delegated, or such as are necessary for the exercise specifically delegated, cannot acquire from one state a power within that state which has not been delegated to the federal government by the states. In order to change or amend powers delegated to the national government, or to give it new powers, at least three-fourths of the states must consent thereto, and the amendment must be promulgated and adopted in the manner pointed out by the Constitution.

As we read and construe the Mississippi Unemployment Compensation Law, the state does not surrender any of its power over the subject-matter of the act. The state is given power to place its unemployment funds temporarily under the control of the Federal Treasury, for investment in securities named in the Social Security Act; and the federal act, in undertaking to give to the state certain aid or advantages, may name a provision upon which the grant may be made—which the state will be free to accept or reject so long as it is not prohibited by any section of the State Constitution, or by the rights reserved to the citizens, recognized and secured in section 32 of the Mississippi Constitution, and in the Tenth Amendment to the Constitution of the United States, reserving to the states all rights not granted to the federal government. As the state is free to accept or reject this proposition, and to withdraw at any

time from the arrangement when, in its opinion, it should do so, we cannot see that there is any delegation of the state authority to the national government.

A state, under its police power, has very large authority and discretion as to the recognition of public needs, and may provide for them by suitable legislation. This state has often exercised this power in the regulation or management of business affecting public welfare, and has enacted laws in restraint of acts deemed inimical to the public welfare or not promotive of the public good. In Pate v. Bank of Newton, 116 Miss. 666, 77 So. 601, the state provided for the creation by the banks of a fund to guarantee deposits in banks, to which fund all state banks doing business in the state were required to contribute. The constitutionality of that statute was challenged and upheld in that case, and in others. In State v. Newman Lumber Co., 102 Miss. 802, 59 So. 923, 45 L. R. A. (N. S.), 851, the court upheld the law limiting the hours of labor for adults in and around machinery deemed to be dangerous to the safety and welfare of laborers working long hours. It was insisted in that case that the state was without power to control the hours of labor for adults, and that the right of contract was violated by that act. Since the servants of the lumber company were adults, possessing the liberty to make contracts, it was contended that this would prevent the state from abridging the hours of their labor; but the court held that it was within the police powers of the state to limit the hours of labor of men working around machinery, and that the Legislature was warranted in doing so.

In State v. Crescent Cotton Oil Co., 116 Miss. 398, 77 So. 185, it was held that the state not only had the right to prohibit a foreign corporation from entering it for the purpose of transacting business, but also to expel such corporation from the state after it has entered and commenced doing business therein, provided only that such corporation is not thereby deprived of a right

guaranteed to it by the Federal Constitution. And it was held that the state has the right, under chapter 162 of the Laws of 1914, to expel a foreign corporation for violation of the provisions of that statute, and a corporation engaged in the manufacture of cotton seed oil products shall not operate a cotton gin except where its cotton oil plant is located, and imposing a penalty therefor, on domestic corporations. It was also held in this case that the criterion by which to test the constitutionality of a statute is not the fact that such corporations may be inconvenienced thereby.

In Crescent Cotton Oil Co. v. State, 121 Miss. 615, 83 So. 680, it was held that chapter 162, Laws of 1914, prohibiting the ownership of gins at other points than where the company has a plant for the crushing of seed, does not violate the Commerce clause of the Federal Constitution, where the gin located in this state was designed to secure cotton seed to be shipped into another state where the company had its cotton oil plant.

Other cases dealing with the police power, and showing the extent thereof, are Retail Lumber Dealer's Ass'n v. State, 95 Miss. 337, 48 So. 1021, 35 L. R. A. (N. S.), 1054; State v. Armstead, 103 Miss. 790, 60 So. 778, Ann. Cas. 1915B, 495; Hartford Accident & Indemnity Co. v. Natchez Investment Co., 155 Miss. 31, 119 So. 366; Grenada Lumber Co. v. State of Mississippi, 217 U. S. 433, 30 S. Ct. 535, 54 L. Ed. 826; Trustees of University of Mississippi v. Waugh, 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588, Ann. Cas. 1916E, 522; State v. Tucker, 102 Miss. 517, 59 So. 826, 827.

It is urged, also, that the act violates section 63 of the State Constitution, providing that no appropriation bill shall be passed by the Legislature which does not fix definitely the maximum sum thereby appropriated to be drawn from the treasury. A sufficient answer to this contention is that the fund here provided for and collected is not a fund for the general purposes of running the state government, or providing for the expense of

operating the state government. The fund here created is not to be placed in the state treasury—it is a trust fund to be held and applied for the benefit of a class of employes, in the nature of unemployment insurance, and is authorized by law. In other words, the funds here provided are trust funds, and do not belong to the state in its sovereign capacity, but are for the benefit of a group from whose wages, or from whose employees' compensation in the nature of wages, although in form an excise on the right to do business in the state. This was held to be permissible in United States v. Butler, 297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914. In the third syllabus of this case it is said: "An excise may constitutionally be levied on one group for the benefit of another when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation." And, 297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 477, on page 486, in the same case it is said: "We may concede that the latter sort of imposition is constitutional when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation. But manifestly no justification for it can be found unless as an integral part of such regulation. The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end."

In the present case, as we have held, the matter is one about which both employer and employee are concerned, and comes within the power of the Legislature to regulate. It is well known that many persons employed have not the prudence and ability, and foresight to provide in advance, if left to their own initiative, for need in times of stress and unemployment. They are usually employed at a wage that barely meets the needs of current living expenses; they have but little power to control what compensation they shall receive for their labor,

and usually have not the means to withstand unemployment for any considerable length of time without suffering for the necessities of life. The employer, as a rule, has the power to dictate wages, and often the larger concerns have agencies which, by co-operating, can and do control the amount of wages to be paid in their respective fields of operation. Many large corporations have instrumentalities, such as holding companies, which have the power to select managers, and control industries, and have means to withstand, for temporary periods, the need of employing persons. Consequently they are in a superior position to control, and often do control, the number of persons to be employed, the wages they shall receive, and the hours they shall work; and consequently it is competent for the Legislature or the government to step in and see that these powers are not abused, and provide to some extent policies which will prevent unemployment, or moderate its evils. Unemployment on a large scale is a serious evil and menace to the health, morals, and safety of persons who must live by their labor, and to the public generally, because it is well known that there is an increase in crime with reference to property—burglary, theft, robbery, etc.—endangering persons and property.

It is also contended that section 64 of the State Constitution is violated. That section is as follows: "No bill passed after the adoption of this Constitution to make appropriations of money out of the state treasury shall continue in force more than six months after the meeting of the legislature at its next regular session; nor shall such bill be passed except by the votes of a majority of all the members elected to each house of the legislature." And in support of this contention appellants cite Colbert v. State, 86 Miss. 769, 39 So. 65, and Taylor v. Guy, 119 Miss. 357, 80 So. 786. As this money is not property to be put into the state treasury, but is to be held by the state treasurer, who is authorized to place it in the depositories, and to keep it apart and

separate from the general funds of the state, it does not fall within the provisions of section 64 of the Constitution.

We do not pass upon how far the state Legislature may go in creating trust funds, or whether, when they do create a fund, although for trust purposes, which is collected by general taxation, it can be kept out of the treasury lawfully. The section does not apply here, and consequently the act does not violate that section.

. It is also contended that section 134 of the Constitution, providing for the office of state treasurer and auditor of public accounts to be elected, who shall hold their offices for the term of four years, and shall possess the same qualifications as the secretary of state, is violated. We see no violation of this section, nor do we see how it can be applied to the provision here any further than that the treasurer is by law custodian of the funds, and is authorized to disburse them for the purposes of the act in the manner therein provided. We see no reason why the Legislature cannot impose an additional duty upon the treasurer to those imposed by the Constitution. The act here under consideration in no way conflicts with the duties of the treasurer under that section, and under section 137 of the Constitution, which it is also claimed is violated. The latter section provides for the publishing, within ten days after the 1st day of January and July of each year, of a statement under oath, showing the condition of the treasury on that date, the balance on hand, and in what funds, together with a certificate of the Governor that he has verified the count of the funds in the treasury, and found the balance stated by the treasurer actually in the vaults of the treasury, or as the truth may be, etc. This section, of course, has reference to the funds properly and legally confided to the state treasurer by law.

The unemployment act here involved, chapter 176, Laws 1936, as amended by chapter 3 of the First Special Session, page 18, Laws 1936, imposes the duty upon the

Governor, under conditions that may exist at some time, to suspend for a definite period the operation of the law. We are of the opinion that the Legislature may fix conditions under which an act may operate, and conditions under which the law may cease to operate, and confide to some suitable agency of the state the determination of the question of fact upon which the operation is to be suspended, or resumed after the passing of such conditions. The Legislature itself must fix the conditions, and cannot delegate that function, but it may delegate the fact-finding function, as to whether conditions exist, to such agency. This, we think, is sustained by the case of Alcorn v. Hamer, 38 Miss. 652, wherein it is said: ''The whole legislative power of the people of this State is vested by the Constitution in the Senate and House of Representatives; and no part of it can be delegated by the legislature to the whole, or any portion of the people, or to any other department of the government; nor can the Senate and House of Representatives associate with themselves, in the exercise of legislative functions, any person, power, or tribunal whatever.'' And that: ''An act, which is a mere legislative preparation, plan, or project of a law, and which is to be submitted to the people for their adoption or rejection, is unconstitutional and void; but when the act is complete in itself,—having received its final sanction from the legislative will, and which by its express terms, goes into effect as a law, it is a valid exercise of legislative power, although the excution of some of its provisions is made to depend upon the result of the vote of the people of the district or county, who are affected by it.''

See, also, Board of Election Com'rs of Rankin County v. Davis, 102 Miss. 497, 59 So. 811, upholding chapter 112, Laws 1910, amended by chapter 253, Laws 1912, creating the office of county prosecuting attorney, and making the office optional with the different counties of the state by an election, its operation depending upon whether a county, on submitting the matter to a vote,

should vote for or against it. See, also, Barnes v. Pike County Supervisors, 51 Miss. 305. Similar laws have been upheld in Alabama, Massachusetts, and California. See Howes Bros. v. Massachusetts Unemployment Compensation Comm., Mass., 5 N. E. (2d) 720; Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 174 So. 516; Gillum v. Johnson, 7 Cal. (2d) 744, 62 P. (2d) 1037, 63 P. (2d) 810, 108 A. L. R. 595; Chamberlin v. Andrews, 271 N. Y. 1, 2 N. E. (2d) 22, 106 A. L. R. 1519.

We are therefore of the opinion that both in principle and under the authorities the act of the Mississippi Legislature is constitutional; and, the court below having found in accordance with these views, the judgment is affirmed.

Affirmed.