COMBINED METALS REDUCTION CO. et al.
v. INDUSTRIAL COMMISSION.

No. 6315.   Decided September 15, 1941.   (116 P. 2d 929.)

Rehearing Denied February 25, 1942.

See 39 C. J. Master and Servant, sec. 362; 35 Am. Jur. 447.

*H. Van Dam, Jr.,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *S. D. Huffaker,* Deputy Atty. Gen., for defendant.

*A. N. Ferro, F. F. Dremann,* and *George A. Critchlow,* all of Salt Lake City, amici curiae.

LARSON, Justice.

This cause involves what is commonly known as a mining lease.  The facts and the issues are substantially the

same as those involved in the National Tunnel and Mines case. There are some minor differences in the "lease," but they are not such as change or affect the questions involved. All questions here presented were involved and decided in the case of *National Tunnel and Mines Co.* v. *Industrial Commission*, 99 Utah 39, 102 P. 2d 508, and upon the authority of that case, the decision of the Industrial Commission is affirmed.

MOFFAT, C. J., and McDONOUGH, J., concur.

WOLFE, Justice (concurring in the result).

I concur in the result. That the provisions of the "lease" in the case of *National Tunnel & Mines* v. *Industrial Commission*, 99 Utah 39, 102 P. 2d 508, and the conduct of the parties as revealed in the evidence of that case made it a service relationship within the meaning of the tests provided by Sec. 19(j) (1), Laws 1936, Sp. Sess. c. 1, § 19(j) (1), as amended by Laws 1937, c. 43, elaborated on in the dissenting opinion in *Fuller Brush Co.* v. *Industrial Commission*, 99 Utah 97, 104 P. 2d 201, I have no doubt. Further elaboration will be found in the Columbia Law Review, Vol. XLI, No. 6, p. 1015,, under the title "Determination of Employer-Employee Relationship in Social Legislation." That the service relationship was one which was not excluded from the act by Sec. 19(j) (5) (a) (b) (c), I also entertain no doubt. While the provisions of the "lease" in the instant case differ in some respects materially from those of the "lease" in the National Tunnel case, I must conclude that the contract between the parties still shows a service rather than a lease relationship.

The determination of whether the contract in this case was in reality a lease, or actually gave rise to a service relationship, must be arrived at by an actual analysis of the provisions of the so-called lease, and the conduct of the parties under it, which task I now undertake. In doing this I shall compare the provisions as far as possible with those

of the "lease" which we had before us in the case of *National Tunnel & Mines Co.* v. *Industrial Commission,* supra. We find in this "lease" provisions similar to those in the National Tunnel case. The lessee shall work the mine in good and miner-like fashion (1); shall not employ or bring on the premises any persons objectionable to the lessor; shall supervise the work personally (3) and assist in the performance thereof; shall work a certain number of shifts; shall not sub-lease without lessor's consent; shall pay tramming, smelting and handling charges (3); shall not obstruct main openings (2) nor stow waste underground except on lessor's consent (2); shall allow track and loading chutes to remain at the termination of the agreement; and shall allow Company agents to enter, inspect, survey, and take samplings of ore. (1)

The lease in the National Tunnel and Mines case provides that lessee should be subject to Company orders as to the use of bins, drifts, blacksmith shop and ore bins; that lessee should comply with and obey all rules affecting the premises; should adopt the Company's time for commencement and ending of each shift; adopt and enforce the same rules for itself and employees as governed Company employees; and should allow the Company to regulate operations between its employees and those of the lessee. We find no such detail in the contract now before us. The lease with the Combined Metals & Reduction Company contained a provision for a "right of way for the company or its employees or its other lessees or their employees through all workings existing or that may be made within said premises." (2) Testimony also showed that while lessees originally handled their own waste it was later handled at lessee's expense on the Company tram, but that as to this and shipments of ore and their operations generally, it was up to the several lessees to arrange between themselves and jointly with the Company as to its operations in order to avoid conflicts. When questioned as to this, one of the lessees in testimony before the referee stated: "Not enough business goes out of the mine to have any arguments."

A further and highly important element of control in the Combined Metals and Reduction Company is found in the clause by which the lessor reserves the right to terminate the lease on 30 days' notice at any time at the discretion of the mine superintendent. This element was not present in the lease in the National Tunnel & Mines case. Obviously its effectiveness in assuring what I have chosen to term the lessee's "voluntary cooperation" with the Company would be as great as other provisions detailing the Company's right of control.

There remains for our consideration a comparison of the provisions regarding the property rights in and marketing of, the ore as well as the method of computing royalties the companies derived from the leases. In the National Tunnel & Mines case, it was provided that the ore should be delivered to the International Smelting & Refining Company; that the company reserved property and right of property in all ores mined; that the company should be the sole judge as to whether it was a profitable time for smelting; and that all shipments should be made by the lessee in the company's name. The instant case does not expressly reserve to the Company, property rights in the ore, but states that all ores shall be marketed in the name of and by the Company or may be purchased by the Company for treatment at its own reduction plant. In the National Tunnel & Mines case, after deducting for expenses involved, the amount the lessee received for the ore depended on the number of individuals engaged in the work. In this lease, lessees pay "rent" to the Company in the form of royalties which the Company deducts from the "net value" of the ore it sold for lessees, after making deductions for shipping, treatment, sampling, and assaying, the Company's royalties being graduated from 30% to 40% as the value of the ore increased. It was brought out in the evidence that by marketing, shipping, and smelting in the Company's name, lessees obtained more favorable rates. The same benefit might accrue to the Company. The material factor here is that

lessees have no discretion or control as to the disposition of the ore. The Company alone has the power to market or dispose of any property right in the ore.

In some respects the "lease" in the instant case is less favorable to control by the lessor than in the National Tunnel & Mines Co. case, supra. In other respects, it is more favorable. In both "leases" there are provisions which, if they stood alone, would be perfectly consistent with a true lease. These are the provisions regarding working the lease in a miner-like manner and inspection and sampling which are consistent with a true lease, which are designated here-inabove by the figure "1." Provisions which are necessary to save the rights of the company or other true lessees in the working of property, are designated by "2"; and those which protect the company from waste, are designated by the figure "3." Also, provisions as to what structures shall remain at the end of the lease are provisions of an ordinary lease.

But provisions that the lessee shall not only supervise but assist in the performance of the work and work a definite number of shifts; and that the lessor, may use an uncontrolled veto power as to persons coming on the property; and the provisions giving the company the right to market the ore in its own name or have it purchased by the company, giving the company, therefore, control of the product as it is mined and the right to make distribution of the proceeds and, above all, the right to cancel the lease on 30 days' notice, set up the very elements by which, in the field of agriculture, we distinguish a share cropper agreement from a lease on shares—a problem analogous to the one before us. In the instant case the lessee does not obtain exclusive possession. He simply obtains, subject to cancellation, or possession for an indefinite time, the right to work on and in the premises, the right to explore for ore. It is a license to mine ore as defined in 40 C. J. p. 991, Sec. 585:

"There is a broad distinction between a lease of a mine, under which the lessee enters into possession and takes an estate in the

property, and a license to work the same mine, in that in the latter case the licensee has no permanent interest, property, or estate in the land itself, but only in the proceeds, and in such proceeds not as realty, but as personal property, and his possession is the possession of the owner, and in determining whether a particular instrument is a lease or a license, consideration should be given to whether the grantee acquires an estate in the land, whether the consideration is for the entire subject conveyed by title, and whether the contract contains any words of grant or demise."

The "lessee" in this case obtains little more property interest than does a share cropper. In fact, in some respects he seems not to be in as good a position as a share cropper because his tenure may be cancelled without cause before he discovers or garners a crop. Certainly, no one would contend that a share cropper had a lease of the land. He is universally recognized as a worker who receives a share of the crop as his wages. If there is no crop he receives no wages, much as in a mining lease if there is no pay ore mined the "lessee" receives no wages. There is such a thing as a lease of farm lands with the provision that the rent payable shall be a share of the crop raised. But in determining whether the contract is one for labor payable in kind, or a lease with the rent payable in kind, the very factors which we have discussed above are controlling. The courts inquire into the question of the owner's right to direct the farmer's performance; whether he has the right to come on the farm at will; whether he has the right at harvest to take the crop and divide, or whether the farmer has the custody of it and may do the dividing. If it appears by contract or in fact that the owner had the right of entry at will, not only to see that there was no waste and that the occupant was conducting the operations in a husbandlike manner but to direct the manner, means and method of performance, it is held that the occupant is a farm laborer on shares and not a tenant on shares. *Halsell* v. *1st Nat. Bank of Coweta*, 235 P. 532, cited in Words and Phrases, Perm. Ed. Vol. 39, p. 164:

"If the contractual relation between the parties is to the effect that the land-owner is to have supervising possession of the land to be cultivated, and the party working the land is to be a wage earner, whether in terms of money or part of the crop, the relation is that of landowner and 'share cropper'; but if the landowner or the person who has the right to possession of the land contract with the party who is to cultivate the land, by which such party is to have exclusive possession of the land to be cultivated for a definite term and the consideration to the landowner is in money or a part of the produce raised on the farm, then the relation is that of landlord and tenant."

Certainly with a right in the lessor to terminate the lease on notice, thus potentially exercising control, the right to require the lessee to work personally and for a certain number of shifts, the right to receive the proceeds and to divide the same, the control seems more like that of a share cropper agreement, than a lessee on shares. I do not see how we can treat it otherwise and logically retain the time-honored distinction between a lease on shares and a hiring on shares. The so-called mine lease in this case was in effect and in fact, a "service * * * performed under a contract of hire." It should be noted that Sec. 19(j) (1) specifies that employment "means service * * * performed for wages or under any contract of hire," etc. (Italics added.) In this case, wages were contingent but the contract of hire was definite. By all analogies we have in the law this was a service relationship.

In this case the "lease" was a means—an instrumentality —to accomplish the business purposes of the mine owner. It cannot be said to have transferred to another the possession or interest in a piece of land for his independent exploration. It was definitely a part of the business of the plaintiff corporation and a method of its accomplishment. I do not know the evolution of the present type of mining lease. It may be that in the early days of mining there might have been leases in the true sense. On the other hand they may never have been true leases but only a device to obtain exploratory work on one's property without pay-

ment of remuneration, except in case the party (lessee) himself uncovered the means of his own remuneration. When mining property was still in the stage of exploration or early development, the locator or owner, who was himself taking a gamble, might have leased a part to others inviting them to share in the gamble. But when mining prospects grew into proved producers, sometimes into great industries, and more and more limiting provisions were put into the so-called "leases," giving more and more control over the lessee and often so adjusting the royalties in case ore was found, that it would be unlikely to yield more than wages, there should be very little doubt that such arrangement was one for the purpose of obtaining the services of another to explore, prospect and develop it, although called a lease. It is our duty to construe these laws according to their intent and purposes, and no group or press, however powerful, should divert us from that duty. The fact that it may be deemed desirable both by the mining industry and by the miner to have it construed as a lease cannot alter the nature of our task. We are not legislators. In our decisions respecting such legislation, we are not amenable to the desires of any group but only to the will of the people, as it is legislatively expressed, and in that regard ultimately to our own consciences.

I do not say that this "lease" might not, with some modification, be made to fall on the non-service side of the line. If for instance, the cancellation feature, the obligation to work personally and the right to exact a certain amount of work were withdrawn it might "get by." It is, of course, dangerous to give advance opinions, even tentatively. That is not our function. But, I am inclined, without definite commitment, to believe that the features which give the "lessor" custody of the ore mined and the right to control the proceeds and to make division, might be harmonious with a mutually economical arrangement rather than be construed as features inconsistent with a lease. Likewise, it appears that there may be a distinct difference between

provisions which purport to bring about a better coopera-
tion between truly independent operations of the lessees
themselves and/or between such operations of the lessees
and the lessor, so as to prevent interference, and those which
coordinate integral parts of a unit business. Similarly, pro-
visions which do not go beyond those necessary to prevent
waste or protect the owner against improper mining meth-
ods, would be consonant with a real lease. It should go with-
out saying, however, that even were the provisions such as
to make it really a "lease," the actual conduct of the parties
independent of the contract would still have to be considered.

The typical lease in Colorado seems to differ in some es-
sential features. There the leases are for a definite period
of time but terminable by reason of failure to comply with
the requirements of the Mining Inspector or by reason of
the lessee's failure to comply with the terms of the lease.
The Attorney General of Colorado, in an opinion rendered
on March 15, 1941, to the Governor of Colorado states:

> "It is also typical of these leases that the lessees do not confine
> themselves to any particular hours of labor, but on the other hand
> will avail themselves especially in remote districts of every oppor-
> tunity to work as they see fit."

The provisions for a specified amount of work definitely
integrates with the conception of development work desired
to be accomplished by the lessor—a conception which at-
tunes with services to be performed for him rather than
with the idea of rental of property for the independent pos-
session and use of another.

The service or non-service relationship can, of course, not
depend on the state of mind of the parties, but must be read
from the contract and the conduct of the parties. If "A"
works or performs services for "B" and is paid in goods,
it matters not whether the motivation for the service was
"A's" desire to buy the goods and pay *in services*, or B's
desire to have "A" perform services and be paid in goods.
The essential fact is that "A" performs services for wages
(which is defined by Sec. 19 (p) as "all remuneration pay-

able for personal services, including * * * all remuneration payable in any medium other than cash,") under a contract of hire. The fact that in the hire, one person to the contract is actuated by the motive of disposing of a chattel, or the other party to the contract is motivated by the desire to acquire a chattel, does not change the result that service is performed.

Nor of course is it a mystery that there may be situations not covered by the act deserving of help. In *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327, the court said:

"In establishing a system of unemployment benefits the legislature is not bound to occupy the whole field. It may strike at the evil where it is most felt (citing numerous cases), or where it is most practicable to deal with it (citing cases). It may exclude others whose need is less (citing cases), or whose effective aid is attended by inconvenience which is greater (citing cases)."

PRATT, Justice (dissenting).

I dissent. The question we have before us is this: Does this mining lease create the service relationship contemplated by our Unemployment Compensation Law?

The purpose of the law is declared in section 2, Laws 1936, Sp. Sess. c. 1. That section reads:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

As stated in the first sentence, this section is a "guide" to the "interpretation" and "application" of the law.

Were we to find in this section 2 that the "menace" to the "health, morals, and welfare of the people of this state"

was an epidemic of typhoid fever, and were we to find that the sections following prescribed sanitary and medical methods to ascertain and eradicate the individual instances of disease which together constituted the epidemic, we would have little difficulty in appreciating that the law was enacted for the benefit of the public and not the individual, nor the group of individuals. The locating and curing of the individual case would appeal to us simply as an incident in the enforcement of the law for the public good. That the individual received personal benefit from the law enforcement, though a pleasing fact, would not be the inducement for enforcing the law. Furthermore, the individual with an ailment in no way connected to the epidemic would be one upon whom neither public expense nor public time would be expended as part of the law enforcement. To afford him relief would not be a step toward relieving the public of its typhoid menace.

The fact that section 2 refers to the menace as "unemployment" rather than typhoid fever does not change the principles enunciated above. Unemployment as contemplated by the law is an economic menace to the public. If the individual case of unemployment is not of the type which is an economic menace to the public it is comparable to the case of the individual whose ailment is not connected to typhoid fever—we do not concern ourselves with it, be the individual's plight ever so pathetic.

The unemployment Compensation Law has laid down rules whereby we may determine whether or not a given case is one to receive the benefits of its enforcement. Those rules may be classed generally as of two kinds: (1) Those limiting the law to a certain class of relationships, and (2) those exempting from that class lesser classes.

Sections 19 (j) (1) and 19 (p) are of the first kind; section 19 (j) (5) is one of the second. Section 19 (j) (1) reads:

" 'Employment,' subject to the other provisions of this subsection, means service, including service in interstate commerce, performed

for wages or under any contract of hire, written or oral, express or implied."

Section 19 (p) reads:

"'Wages' means all remuneration payable for personal services, including commissions and bonuses and cash value of all remuneration payable in any medium other than cash. Gratuities customarily received by an individual in the course of his employment from persons other than his employing unit shall be treated as wages payable by his employing unit. The reasonable cash value of remuneration payable in any medium other than cash and the reasonable amount of gratuities shall be estimated and determined in accordance with rules prescribed by the commission."

These two sections define generally the contractual relationships which are believed to be the bases from which springs the kind of unemployment that in numbers is by section 2 declared to be an economic menace to the public. These two sections define contractual relationships which we term service relationships. Examples of these are: employer and employee, master and servant, principal and agent, and principal and independent contractor. They are distinguished from non-service relationships such as vendor and vendee, or lessor and lessee, in that the factor that induced their execution is the desire of one contracting party for the service of the other, and the desire of the latter to render that service. The non-service relationships mentioned, however, arise from a desire to dispose of and a desire to acquire either permanently or temporarily property interests. For example: I learn that my neighbor wants to sell his automobile; he learns that I want to buy a second-hand car. We get together, it matters not how. I agree to buy and he agrees to sell. The factor that induced this contract was our desires as to a property transfer. Suppose that I, for reasons best known to myself—Scotch if you wish—desire to pay for the car in labor, the labor to be performed under his control and direction. He is agreeable. Has the contract become any the less a contract of sale? No. The fact that the consideration has become in

whole or in part labor instead of cash does not change the contract. Furthermore, an unexpected termination of that sales contract does not produce a case of unemployment which is an economic menace to the public.

Contrast the above illustration with the following: I am a carpenter. My neighbor wants a chicken coop built. I want to build it. We get together. He is short of cash but is willing to give me his automobile in payment. I don't want an automobile, but as I can sell it and get my pay that way, I accept. What induced the contract? A desire for and a desire to render services. The fact that the consideration was payable in whole or in part by property instead of cash did not change the nature of the contract. I take the automobile as "remuneration payable in any medium other than cash" (quoting from section 19(p) above).

In each illustration the important question is: what induced the parties to enter into the contractual relationship? If the service factor, it falls within sections 19(j) (1) and 19(p); if the non-service factor, then those sections exclude the contractual relationship from the benefits of the Unemployment Compensation Law.

It is clear that the provisions of section (19(j) (5) have no bearing upon the application of sections 19(j) (1) and 19(p). Section 19(j) (a), (b), (c), (5) reads:

"Services performed by an individual for wages or under any contract of hire, written or oral, express or implied, shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(a)   such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(b)   such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(c)   such individual is customarily engaged in an independently established trade, occupation, profession or business."

There are service relationships unquestionably within the definitions of section 19(j) (1) and 19(p), but which, if terminated, are not, in the eyes of this law, productive of the kind of unemployment which in numbers, and according to section 2, is an economic menace to the public. We may not agree with this legislative classification here; but that classification has been made. Section 19(j) (5) excludes from service relationships generally within the law, those whose occupations are in the nature of a business of engaging in many separate service relationships, with the expectation of losing some and gaining others—such as the professional man in private practice. In the eyes of the Unemployment Compensation Law, to give him its benefits would not be a step toward eradicating the public menace of unemployment, be his financial condition ever so pathetic. To illustrate the fallacy of attempting to use the provisions of 19(j) (5) in applying sections 19(j) (1) and 19 (p), this is suggested: Paragraphs (a), (b), and (c) are in the conjunctive. They must all exist to exclude the case from the benefits of the law. Applied to the assumed case of my purchase of my neighbor's second hand car, they would place me, upon unexpected termination of that contract, as a beneficiary of the law simply because as part of the consideration in the sale of the automobile, I had submitted myself to the control of the vendor. It would change our contractual relationship from a non-service to a service relationship. Such a misapplication of the provisions of section 19(j) (5) would change the purpose of the law as outlined in section 2 quoted above.

Keeping these thoughts in mind, what should be said of the mining lease? No one contends that the mere label, "lease," governs the case. The true relationship between the parties is always subject to inquiry. In the recent case of *National Tunnel & Mines Co.* v. *Industrial Commission,* 99 Utah 39, 102 P. (2d) 508, we decided that a lease similar to the one in the present case created the service relation-

ship contemplated by the Unemployment Compensation Law. In so deciding, such expressions as these were used:

"* * * there are definite provisions made for the control and direction over the performance of the service * * *" and "There is provided in the lease a general right of control and direction over the relationship created under the contract."

Paragraph (a) of section 19(j) (5) is the paragraph covering "control" as an element in determining whether or not a given service relationship is one to be excluded from the act. It, however, assumes the relationship to be one of service, whereas the question in issue here is: Is there a service relationship?

I concurred in that part of the National Tunnel & Mines Company case, but I am now of the opinion that it was error to do so. The provisions of the wrong section of the law were applied. It has been suggested that the facts of the present case may be distinguished from the Tunnel & Mines case in that certain elements of control present there are lacking here. The objection the writer has to such an argument is that it, too, applies the wrong provision of the law to answer the question of whether or not the relationship is one of service.

The mining lease is not an instrument that has come into being as a result of the enactment of the Unemployment Compensation Law. Its historical background is not necessarily determinative of its character. It is an element however, deserving of consideration, along with other facts, in an effort to solve the question in issue.

The mining lease has provisions consistent with both the service and the non-service relationships. Viewed in one light it has the appearance of a business venture on the part of the lessee wherein he, as consideration for the right to occupy and work the lessor's land, is willing to share the profits, if profits there be, from the sale of ore mined. Viewed in another light, it is just another method the lessor has of obtaining services to develop its property. Ar-

guments may be given both ways. Under such circumstances the character of the relationship as custom and usage have developed it should be the guiding factor. That character is a fair indication of what induced the execution of such an instrument.