SNYDER MINES, Inc. v. INDUSTRIAL COMMISSION.

No. 7310.   Decided April 25, 1950.   (217 P. 2d 560.)

See 61 C. J., Taxation, sec. 9. Who are employees within compensation statutes, see note, 129 A. L. R. 990. See, also, 58 Am. Jur. 664.

*Herbert Van Dam., Jr.,* Salt Lake City, for plaintiff.

*Clinton D. Vernon,* Attorney General, *Fred Dremann,* Salt Lake City, for respondent.

WOLFE, Justice.

This is an original proceeding to review a decision of the Industrial Commission holding that the plaintiff, The Snyder Mines, Incorporated, had paid wages to its president, E. H. Snyder, to certain truckers, and to certain so-called lessees for services performed by them while in the employment of the plaintiff corporation, and that the plaintiff was subject to the payment of percentage contributions to the unemployment compensation fund on said wages.

On January 9, 1941, a representative of the Department of Employment Security of the Industrial Commission entered a determination to the effect that certain "lessees" under "lease agreements" with the plaintiff were in the employment of the latter during 1936, 1937, 1938 and 1939, and that unemployment compensation contributions in the amount of $10,892.69, plus interest, were due on the wages paid the "lessees." The plaintiff disagreed with this determination and pursuant to the Employment Security Act appealed to an Appeal Tribunal. The appeal was postponed by stipulation of the parties pending the decision of this court in *Combined Metals Reduction Co.* v. *Industrial Comm.*, 101 Utah 230, 116 P. 2d 929, decided September 15, 1941, due to the fact that one of the issues in that case was whether a "lessor" mining company was required to pay contributions upon the receipts of "lessees" under a mining "lease" substantially similar to the "leases" in question.

On February 23, 1943, an additional determination was entered by a representative of the Department of Employment Security. This determination was to the effect that the plaintiff had failed to pay unemployment compensation contributions on wages paid to "lessees", truckers, and to E. H. Snyder, president of the plaintiff corporation, for services performed by them while in the employ of the plaintiff during 1940, 1941 and 1942. The plaintiff dis-

agreed with this determination also, and subsequently appealed to an Appeal Tribunal.

After hearing both appeals on August 13, 1943, the Appeal Tribunal entered a decision affirming the determination of the Department representative except for contributions accruing on wages paid during 1936 and 1937 which the Tribunal held were barred by a statute of limitations. Later that same month the plaintiff appealed to the Industrial Commission from the decision of the Appeal Tribunal. No action was taken by the Commission until November 22, 1948, at which time a hearing on the appeal was held and on March 1, 1949, the Commission affirmed the decision of the Appeal Tribunal.

We will first consider whether the Commission erred in concluding that the plaintiff paid "wages" to E. H. Snyder while he was in the "employment" of the plaintiff. In our consideration of this question the following definitions from the Employment Security Act should be kept in mind. Sec. 42-2a-19, Utah Code Annotated 1943, provides:

"(p) 'Wages' means all remuneration for personal services, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. Gratuities customarily received by an individual in the course of his employment from persons other than his employing unit shall be treated as wages received from his employing unit. The reasonable cash value of remuneration in any medium other than cash and the reasonable amount of gratuities shall be estimated and determined in accordance with rules prescribed by the Commission;   *   *   *."

"(j) (1) 'Employment' means any service performed prior to January 1, 1941, which was employment as defined in the Utah Unemployment Compensation Law prior to the effective date of this act, and subject to the other provisions of this subsection, service performed after December 31, 1940, including service  *  *  *  as an officer of a corporation performed for wages or under any contract of hire written or oral, express or implied."

However, not all services performed for wages or under a contract of hire constitute "employment." Subsections

(j) (5) (A), (B) and (C) of section 19 provide an exclusion test:

"(j) (5) Services performed by an individual for wages or under any contract of hire, written or oral, express or implied, shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

The only testimony as to the nature of the work performed by E. H. Snyder came from his brother, Neal Snyder, general manager of the plaintiff corporation. He testified in substance that:

E. H. Snyder was president of the plaintiff corporation and was also vice-president and general manager of the Combined Metals Reduction Co. The two companies maintain offices across the hall from each other in the Felt Building in Salt Lake City, Utah. E. H. Snyder has no office other than that maintained in connection with Combined Metals. During 1940, 1941 and 1942, (the years here in question) Snyder had nothing to do with the administration and direction of the plaintiff corporation, but his services were professional and only concerned with the metallurgy and geological aspects of the plaintiff's operation at Mercur, Utah, where it had a serious metallurgical problem. At odd times, but whenever possible, he would be consulted as to what was best to do with regards to metallurgical problems and ore trends at the mine. Snyder was paid a regular monthly salary totalling ten thousand dollars per year and he performed no services for compan-

ies other than the plaintiff corporation and Combined Metals Reduction Co.

It is apparent that E. H. Snyder rendered services for wages as defined by the Act to the plaintiff company, and that his services did not meet all three of the requirements of the exclusion test posed in subsection (j) (5) (A), (B), and (C). While his services were of a professional nature, there is no evidence that Mr. Snyder was customarily engaged in an independently established profession of the same nature as that involved in the contract of service. On the contrary, his whole time appears to have been consumed in serving as vice-president and general manager of Combined Metals and in rendering technical services to Snyder Mines, Inc. Mr. Snyder did not make his professional services available to the general public. It matters not that most of his time was spent in the service of Combined Metals and that only a small fractional part of his time was available to the plaintiff. All of Mr. Snyder's services to the plaintiff corporation were performed in "employment." There was no error on the part of the Commission in determining that the plaintiff owed contributions on Mr. Snyder's wages paid in 1940, 1941 and 1942.

Secondly, it must be determined whether the Commission erred in determining that the plaintiff owed contributions on the amounts paid to certain truckers who hauled ore for the plaintiff. Neal Snyder testified before the Appeal Tribunal in substance that:

The truckers owned their own trucks and hauled ore either from the bins at the mine or from the open pits where they were loaded by a power shovel owned and operated by the plaintiff, to the stockpiles at the plaintiff's mill. There were no written agreements between the parties but only oral understandings that the truckers were to receive twenty-five cents for every ton of ore they hauled. The truckers did not always work full days either because

there was no ore to be hauled or because they had other trucking jobs which paid them better. When the stock-piles at the mill were full, the mill could run for three or four days before more ore would have to be hauled. The plaintiff insisted that the truckers fill the stockpiles to the limit. Whenever there was ore to be hauled the truckers, if they desired work, would report to the pit boss. The length of the haul was about five-eighths of a mile over the plaintiff's property. Each trucker weighed his own load on the plaintiff's scales and the plaintiff's weighmaster kept account of the tonnage hauled by each trucker. Twice a month on regular settling-up days the truckers were paid. Each trucker maintained his own truck at his expense. The truckers were free to terminate their relationship with the plaintiff at any time and the plaintiff likewise was free to refuse to allow any of them to haul had it so desired at any time.

At the close of the hearing on appeal before the Industrial Commission, the Commission requested counsel for the plaintiff corporation and for the Department of Employment Security to prepare and submit within thirty days a breakdown of the duties of the truckers. Both counsel expressed a willingness to do so. The Department of Employment Security furnished the Commission a copy of a "confidential special report" made by field auditors for the Department. In this confidential report, the auditors stated that they were unable to find upon investigation that any of the truckers held permits of any nature from the Public Service Commission or any other evidence that they were engaged in an independent trade or occupation. The report further stated that it appears that the truckers took orders from the plaintiff corporation as to when and where the hauling was to be done and that the corporation exercised control over their services. In the report a letter written by Neal Snyder to the Department in 1942 was quoted wherein Neal Snyder stated that the truckers worked only during the hours that the plaintiff's shovels operated and·

that the truckers disposed of the ore and waste as the plaintiff directed.

From the testimony of Neal Snyder and the contents of the confidential report, the commission could have reasonably found that the truckers were in the "employment" of the plaintiff. They performed a service for the plaintiff and their services do not meet all three requirements of the exclusion test contained in subsections (j) (5) (A), (B), and (C). First, it appears that the performance of their services was in reality subject to the control and direction of the plaintiff corporation although there is evidence that the plaintiff accorded them considerable latitude as to when they could work. Secondly, their services were not outside the usual course of the mining business nor were they performed off the premises of the mining company. Hauling ore from the mine to the mill was but one integral part of the plaintiff's operation. Thirdly, it does not appear from the evidence that the truckers were customarily engaged in an independently established business of the same nature as that involved in the contract of service with the plaintiff. While the truckers did not devote all of their services to the plaintiff, but worked contemporaneously for others, it does not appear that they did so in the pursuit of an independently established business, but under contracts of hire of the same nature as their contract with the plaintiff corporation.

Counsel for the plaintiff states in his brief that he was unaware of the contents of the confidential report submitted by the Department until he obtained the record of this case from the clerk of this court to prepare his brief, and that in all fairness the report should have been ■ called to his attention in order that he could have met the evidence contained therein. Counsel's position is well taken. The plaintiff should have been furnished a copy of the report by the Department and given an opportunity to offer counter-evidence. For this reason the decision of the Commission insofar as it pertains to the

truckers must be reversed and remanded to the Commission with instructions to re-open the hearing to allow the plaintiff that opportunity.

The plaintiff's third contention is that on January 9, 1941, when the determination was entered that the so-called lessees had been in the employ of the plaintiff during 1936, 1937, 1938, and 1939, the Tax Commission and not the Industrial Commission had the statutory ▪ authority to collect contributions to the unemployment compensation fund, and hence the determination made by the Industrial Commission was void and still is void despite the fact that on July 1, 1941, the legislature gave the Industrial Commission the authority to collect contributions. The plaintiff relies upon *National Tunnel & Mines Co.* v. *Industrial Comm.*, 99 Utah 39, 102 P. 2d 508, 514, where we held that an order made by the Industrial Commission before July 1, 1941, ordering an employer to pay contributions to the fund should be set aside because the Industrial Commission had no such power. There is no merit in this contention. The determination entered January 9, 1941, in the instant case is not an *order* requiring the plaintiff to pay contributions to the fund. It is nothing more than a finding based on audit reports of the plaintiff's payrolls that additional contributions and interest thereon were due. The plaintiff was notified that if it disagreed with the determination it had the right to request a review of the determination within ten days. The notice of the determination did not order that the plaintiff pay the amounts due, but stated that if no review were requested by the plaintiff within ten days the audit report would be submitted to the Tax Commission "for the purpose of assessing and collecting the tax due."

The plaintiff's last contention is that Section 42-2a-14, U. C. A. 1943, is unconstitutional wherein it empowers the Industrial Commission to collect contributions to the unemployment compensation fund because it is in violation

of Article XIII, Sec. 11 of the Constitution of Utah which provides that:

"The State Tax Commission shall administer and supervise the tax laws of the state."

Thus we must determine whether unemployment compensation contributions are "taxes" within the meaning of the above quoted provision of the Constitution. This same question was alluded to but not decided in *National Tunnel & Mines Co.* v. *Industrial Comm.*, supra [99 Utah 39, 102 P. 2d 517]. There in a concurring opinion, the author of this opinion pointed up the question thus:

"Certainly there is a distinction between 'contributions' to a fund which is designed for the welfare of a class and a tax for general purposes, although both are 'exactions', and even though the effect of both is the same on the payer. It is important, to keep our nomenclature correct but more important that our concepts not be confused. It may well be that the type of contribution which is exacted for the Unemployment Insurance Fund is not a 'tax' in the sense that that term was used in the constitutional provision which gave the Tax Commission administration and supervision of tax laws. Certainly the contributions may be looked at as payments into a fund for specific purposes—the whole encompassed by the police power even though not regulatory. * * *

"The Unemployment Compensation Act sets up a plan which places on the employing class the duty of bearing one of the burdens which the law in its march now considers one of the hazards of industry, to wit: unemployment. Disability by accident in industry has long been considered one of the incidents which industry must be prepared to meet. Unemployment may be considered in the same light although in it the relation of cause and effect is not so clear as in cases of disability through accident which occurred during unemployment. Industry may be thought of as responsible for an individual's unemployment in the sense that such unemployment is caused by industry's failure to absorb him. * * *

"Unemployment is considered a responsibility of industry. Hence, industry is required to contribute to a fund to relieve it. The whole scheme of unemployment compensation, including the raising of a fund, may be considered as an integrated whole, all of which falls under police power since only the employee class benefits and only industry, upon whom society puts the direct responsibility, contributes

to alleviate this condition of unemployment of its workers. In that sense the plan is a unit, an integrated whole, a self-contained scheme, under the police power. *Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Commission*, 296 Mass. 275, 5 N. E. 2d 720, 729; *Tatum* v. *Wheeless*, 180 Miss. 800, 178 So. 95. If the general public, regardless of the employer-employee relationship, were taxed, the situation might be different. The difference in the last analysis, may be one in degree between the relation of the unemployed and industry and the relation of the unemployed and the public. * * * Whether the 'contribution' of the employer be considered a tax earmarked for a certain purpose or just one of the elements in a self-contained system for requiring industry to care for its unemployed, may be a difference in conception only, with exactly the same practical results. But it is just these differences in degree and in conception which makes differences in legal holdings and preserve the logical fabric of the law in so far as it is possible to maintain it."

In *Singer Sewing Machine Co.* v. *Industrial Commission*, 104 Utah 175, 134 P. 2d 479, this court announced that the unemployment compensation law was enacted under and as an exercise of the police power of the state and that its purpose is remedial to protect the health, morals, and welfare of the people by providing a cushion against the shocks and rigors of unemployment. This being so, the compulsory payment of contributions to the unemployment compensation fund can clearly be sustained as an element of a "self-contained system" established by the legislature under the police power of the state for requiring industry to care for its unemployed. The contributions required to be paid by employers under the federal Social Security Act, 42 U. S. C. A. § 301 et seq., which are offset to the extent of 90% by payment of contributions to the state, have been denominated taxes on the right to employ labor since it was only through the taxing power of the federal government that Congress could constitutionally require employers to pay contributions. *Chas. C. Steward Machine Co.* v. *Davis*, 301 U. S. 548, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293. But unlike the federal government, the states under their police powers can impose and collect contributions.

Contributions are in reality premiums on a policy of insurance maintained by industry in order that it can meet one of its burdens, viz. unemployment. Contributions are analogous to premiums on workmen's compensation insurance paid by industry to the State Insurance Fund to meet another of its burdens, to wit, industrial accidents. Only employers, not the public generally, are required to contribute to the fund. Reduced rates of contributions based upon the length of time an employer has been in business and upon the stability of his payrolls are afforded to employers who have offered workers a steady means of income and have not increased unemployment in the state. The Employment Security Act provides that the unemployment compensation fund "shall be administered separate and apart from all public monies of the state." The fund is administered by the State Treasurer, not in his regular capacity, but as "ex-officio treasurer and custodian." Contributions when collected never become a part of nor are they commingled with the public funds of the state which are used to meet the general expenses of government. Thus it is evident that contributions in their purpose and administration after collection are readily distinguishable from amounts denominated "taxes" collected from the general public to defray expenses of government and from the taxes actually levied as such by the federal government on the right to employ labor regardless of state laws and by virtue of the federal taxing power. Hence contributions are not "taxes" and the law imposing them is not a "tax law" as meant by Article XIII, Sec. 11, of the Constitution of the State of Utah. Moreover, it is doubtful if "supervision and regulation" of a "tax law" necessarily encompasses the machinery of imposition and collection of taxes if these contributions could be considered "taxes."

The decision of the Industrial Commission insofar as it pertains to contributions due on wages paid to the "lessees" and E. H. Snyder is affirmed; but reversed insofar as it

pertains to the contributions due on the amounts paid the truckers. Each party to bear its own costs.

WADE and McDONOUGH, JJ., concur.

PRATT, Chief Justice.

I concur except I will express no opinion as to the relationship of the truckers to the company until that issue is submitted after proper hearing.

LATIMER, J., concurs in the results.