651 So.2d 998 (1995)
Kirk FORDICE, Governor of the State of Mississippi, Appellant,
v.
Hob BRYAN, Glenn E. Endris, John Horhn and Mike Moore, Attorney General of the State of Mississippi, as Intervenor on Behalf of the People of Mississippi, Appellees.
No. 94-CA-00031.
Supreme Court of Mississippi.
January 12, 1995.
*999 John G. Corlew, Steven D. Orlansky, Leah D. McDowell, Watkins & Eager, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Jackson, Otis R. Tims, Mitchell McNutt Threadgill Smith & Sams, Tupelo, Tacey Clark Humphrey, Mitchell McNutt Firm, Corinth, for appellees.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
Governor Kirk Fordice of Mississippi appealed from a summary judgment decision in favor of the plaintiff legislators and Attorney General Mike Moore in the Chancery Court of the First Judicial District of Hinds County. Governor Fordice argued on appeal that he was properly exercising his partial veto power under Section 73 of the Mississippi Constitution. We disagree and affirm the Chancellor's decision, noting the following:
The most difficult and delicate duty that ever falls to the lot of the court of last resort is ours to-day. In interpreting various provisions of our constitution, we are called upon to declare the boundaries beyond which executive action may not pass, and to fix the limitations upon the executive authority to veto the declared will of both houses of the legislature.

State v. Holder, 76 Miss. 158, 23 So. 643 (1898).

I.
On August 6, 1993, three State Legislators filed a complaint in the First Judicial District of the Hinds County Chancery Court seeking a judgment declaring that the Governor's actions vetoing parts, allowing parts, and amending parts of twenty-nine legislative bills were not authorized by the Mississippi Constitution of 1890 and were a nullity. Attorney General Mike Moore intervened as a party plaintiff on behalf of the people of the State of Mississippi. The case was heard on the merits on the legislator plaintiff's motion for judgment on the pleadings and the Governor's motion for the same relief, or in the alternative, summary judgment. The chancellor, finding the Governor's partial vetoes of those bills invalid, granted summary judgment in favor of the plaintiffs and declared invalid the partial vetos of House Bills 1502, 1613, 1543, 1549, 1550, 1552, 1553, 1557, 1567, 1573, 1577, 1580, 1582, 1587, and Senate Bills 3052, 3054, 3056, 3057, 3060, 3062, 3063, 3066, 3070, 3077, 3085, 3101, 3102 and 3110.
From this judgment, the governor appeals.

II.

FACTS
This action involves bills presented by the 1993 Legislature to the Governor within five days of adjournment sine die of the legislative session on April 4, 1993. The Governor returned the bills to the legislature within fifteen days with a message that he had vetoed parts of twenty-nine bills.
The 1993 Legislature passed House Bill 1613 which authorized the borrowing of $65,882,979 through the issuance of general obligation bonds of the state to finance capital improvements at the state institutions of higher learning and community and junior colleges. The Governor marked through most of the projects listed in the bill, inserted his own lower figure of $8,306,979 and signed the bill "subject to partial veto."
House Bill 1502 passed by the 1993 Legislature authorized the borrowing of $8,000,000 through the issuance of general obligation bonds to finance the acquisition and development of historic properties in the state. The Governor vetoed six of the projects in House *1000 Bill 1502. He also struck sections of that bill detailing how expenditures of the appropriated funds could be made for the projects he vetoed. The Governor struck through the $8,000,000 figure, inserted his own figure of $5,150,000 and signed the bill "subject to partial veto."
Twenty-seven appropriation bills passed by the 1993 Legislature were also modified by the Governor. House Bill 1576 appropriated funds for the state institutions of higher learning for the 1994 fiscal year. Section 17 of that bill forbade the use of any funds appropriated by the bill to raise the salary of the Commissioner of Higher Learning. The Governor crossed through the section and signed the bill.
The other twenty-six bills appropriated funds for particular state government agencies and departments to hire a certain number of employees. In each of these bills, the Governor marked through the number of employees authorized and substituted a smaller figure.

III.

GOVERNOR'S VETO POWER
Article IV, § 73 of the Mississippi Constitution of 1890 states: "The governor may veto parts of any appropriation bill, and approve parts of the same, and the portions approved shall be law." Miss. Const. art. IV, § 73 (emphasis added). Therefore, the Governor is entitled to exercise his § 73 veto power upon "parts" of "appropriation" bills, and only upon "parts" of "appropriation" bills. The Governor may not exercise the § 73 partial veto power on revenue raising bond bills. Naturally the question then arises as to what constitutes a bond bill and what constitutes an appropriation bill.
Article 4, § 63 of the Mississippi Constitution of 1890 provides:
No appropriation bill shall be passed by the legislature which does not fix definitely the maximum sum thereby authorized to be drawn from the treasury.
Article 4, § 64 of the Mississippi Constitution of 1890 provides in part:
No bill passed after the adoption of this Constitution to make appropriations of money out of the state treasury shall continue in force more than two months after the expiration of the fiscal year ending after the meeting of the legislature at its next regular session; ...
Article 4, § 69 of the Mississippi Constitution of 1890 provides:
General appropriation bills shall contain only the appropriations to defray the ordinary expenses of the executive, legislative, and judicial departments of the government; to pay interest on state bonds, and to support the common schools. All other appropriations shall be made by separate bills, each embracing but one subject. Legislation shall not be engrafted on the appropriation bills, but the same may prescribe the conditions on which the money may be drawn, and for what purposes paid.
This case turns on whether House Bills 1613 and 1502 are "appropriation bills" within the meaning of Article IV, § 73 of the Mississippi Constitution of 1890. Whether a legislative enactment authorizing the issuance of bonds to provide for certain specified capital improvement projects is an appropriation bill was discussed in Colbert v. State, 86 Miss. 769, 39 So. 65 (1905). In making this determination, the Court looked to §§ 63, 64, 69, and 73 of the Mississippi Constitution of 1890. The Court held: "The creation of a debt is an entirely different thing from an appropriation for its payment." Id., 39 So. at 67.
The application of the respective Mississippi constitutional provisions leads to the conclusion that House Bills 1613 and 1502 were not appropriation bills within their intended meaning, and instead were a creation of debt. In order for the bills to be susceptible to the Governor's § 73 partial veto power, they must fix a definite maximum amount, § 63, and not continue to be in force withdrawing money from the state treasury longer than two months after the expiration of the fiscal year ending after the meeting of the legislature at its next regular session, § 64. This Court finds that the House bills in dispute do not meet the requirements of § 63 or § 64 for the following reasons.
*1001 At the time of passage of bills authorizing the issuance of bonds, no one knows when the bonds will be sold, what the interest rate on these bonds will be, or when the bonds will mature. For that reason, no bill authorizing the issuance of bonds can contain a definite maximum sum to be paid by the treasury; such a bill fails to meet the constitutional requirement of § 63.
The short expiration period imposed on appropriation bills by § 64 is a characteristic not shared by bond bills. Under § 64, all appropriation bills adopted by the 1993 Legislature expired at the end of August 1994. Most bond bills involve a financing transaction that is not complete until twenty or thirty years after issuance when the bonds are redeemed; such bond bills failed to meet the constitutional requirement of § 64.
We look to the legislative intent behind a statute when interpreting its language and as a general rule we will not look behind the completed acts of the legislature on a constitutionally passed bill. Hunt v. Wright, 11 So. 608, 609, 70 Miss. 298, 304 (1892). Today we do not disturb our holding in Hunt, but rather, follow our normal procedure of looking to the legislative intent when interpreting language of the law. Upon review, it appears that such intent was reflected in the voting history of House bills 1613 and 1502. A revenue bill must be passed by "at least three-fifths vote of the members of each house present and voting." Miss. Const. art. 4, § 70. The House Journal reflected that sixty-nine out of one hundred fifteen votes, (exactly three-fifths), was needed for passage of these bills. Therefore, the legislative intent appears to have been to make these revenue bills, i.e. "bond bills," and not appropriation bills.
It is argued that these bills are both revenue bills and appropriations bills and that the allocation of the bond proceeds to specific projects and the direction to pay interest and principal as and when due out of funds not otherwise appropriated are, in effect, appropriations subject to veto. Assuming arguendo, that this is true, the vetos here in question went beyond the "appropriations" portions of the bills. The governor, by striking the amounts and inserting in lieu thereof his own reduced amount of bonded indebtedness authorized to be incurred, affected the bond portion of these bills in a partial rather than a complete manner, and such action is inconsistent with § 72 and § 73 of our constitution.
This Court finds that House Bills 1613 and 1502 were not appropriation bills within the meaning of the Constitution. Article IV, § 73 of the Mississippi Constitution of 1890 authorizes the Governor to veto parts of "appropriation bills." Moreover to the extent that these bills contain appropriation attributes, the governor's veto went well beyond those attributes and affected provisions which clearly did not appropriate. As these bills were not appropriation bills, his partial vetoes of these bills were unconstitutional. A Governor's unconstitutional attempt of a partial veto is a nullity. See State v. Holder, 76 Miss. 158, 23 So. 643 (1898). Accordingly, House Bills 1502 and 1613 became law.
The trial court ruled against the Governor on the twenty-seven appropriations bills. On appeal, the Governor raised as error the trial court's ruling regarding these bills in his Statement Of Issues On Appeal and made such bills part of the record for our review in his Designation Of The Record filed with the court. Nevertheless, he did not raise any issues concerning these bills in his brief contending they would be moot by the time this case was decided since such partially vetoed appropriations were for the fiscal year 1994 ending June 30, 1994. However, public policy and the magnitude of the importance of these issues requires this Court to review the Governor's actions with respect to the twenty-seven appropriations bills as such actions may continue to be repeated and forever escape review by this Court.[1]
*1002 We expressly adopted the doctrine of `capable of repetition yet evading review' as an exception to the mootness doctrine in Strong v. Bostick, 420 So.2d 1356, 1359 (Miss. 1982). The elements for meeting this exception are (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again. Id. at 1359; citing Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350, 353 (1975). While we have the unusual case of an appellant rather than the appellee urging that we not reach an issue, these principles should nevertheless obtain. The entire judgment was appealed and became the property of this Court. The failure of the governor to brief the issue may be treated as a confession of error but we are not compelled to do so or to ignore the issue. We find the exception to the mootness doctrine applicable in the case sub judice.
The other twenty-seven bills which were partially vetoed were appropriation bills as designated by the legislature itself. In, State v. Holder, 76 Miss. 158, 23 So. 643 (1898), this court disapproved a veto of a condition prescribed by the legislature limiting the purpose for which the money may be paid pursuant to the power vested in the legislature by § 69 of the constitution. That opinion provides the clearest understanding of how § 73 may be properly exercised by the Governor of Mississippi:
Every bill of the character in question has three essential parts: The purpose of the bill, the sum appropriated for the purpose, and the conditions upon which the appropriation shall become available... . The true meaning of section 73 is that an appropriation bill made up of several parts (that is distinct appropriations), different, separable, each complete without the other, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves, may be approved, and become law in accordance with the legislative will, while others of like character may be disapproved, and put before the legislature again, disassociated from the other appropriations.
Id., 23 So. at 645.
The Court finds that the Governor's exercise of the partial veto pursuant to § 73 upon the twenty-seven appropriation bills was not that provision as interpreted by Holder. Here, as there, the governor sought to veto a condition prescribed by the legislature rather than a distinct appropriation.
The legislature's and the governor's power are not unlimited. The Governor is a check upon the spending power of the legislature within our established system of checks and balances. Therefore, the legislature may spend as it sees best just as the Governor may veto bills under § 73 and § 72 as he sees best, but both must still operate within the constitutional parameters established by the drafters of our constitution.
We do not hold today that the Governor's veto power under § 73 is without substance. Rather, we hold that the manner in which it was used and the applicability of this power to the House bills in question was not proper and in accordance with the constitutional requirements. The Governor had and yet possesses the power to veto "parts" of "appropriation" bills under § 73.

IV.

GUBERNATORIAL IMMUNITY
Governor Fordice alleged that he was immune from judicial review when exercising his veto power. We disagree finding that to hold such a position in this state would disrupt our entire established system of checks and balances in government. To do so would be to give an unbridled reign of power to a branch of government that would answer to no one. Sound jurisprudence and our constitution dictate that we cannot allow this to happen in Mississippi.
Several states have rejected attempts by a governor to avoid judicial review of the manner in which he exercised his veto power. In State ex rel. Sego v. Kirkpatrick, 86 N.M. *1003 359, 524 P.2d 975 (1974), the Supreme Court of New Mexico stated:
We fully agree that the exercise of the veto power requires judgment and discretion on the part of the Governor and that he cannot be compelled by the Legislature or by this Court to exercise this power or to exercise it in a particular manner. We do not agree, however, that the manner in which the Governor exercises the power is beyond judicial review or judicial control, if the manner in which it is exercised is beyond the Governor's constitutional authority. The power of veto, like all other powers constitutionally conferred upon a governmental officer or agency, is not absolute and may not be exercised without any restraint or limitation whatsoever. The very concept of such absolute and unrestrained power is inconsistent with the concept of "checks and balances," which is basic to the form and structure of State government created by the people of New Mexico in their constitution, and is inconsistent with the fundamental principle that under our system of government no man is completely above the law.
We find the logic in State ex rel. Sego v. Kirkpatrick, to be sound and illustrative of the manner by which government is to be conducted, and we hold that the Governor is not immune from suit in exercising his veto powers and not beyond judicial review by this Court. Nevertheless, we will not question his judgment in lawfully exercising his veto power, but we must be available to adjudicate the question whether the manner of its exercise exceeds constitutional parameters.
Governor Fordice additionally alleged that he was immune from suit because the legislator plaintiffs lacked standing. We disagree.
Under article III, § 2 of the United States Constitution, the federal courts limit review to actual "cases and controversies." Such restrictive language is not found in the Mississippi Constitution. "Therefore, we have been more permissive in granting standing to parties who seek review of governmental actions." Van Slyke v. Board of Trustees, 613 So.2d 872, 875 (Miss. 1993). We have ruled that parties have standing to:
sue or intervene when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise authorized by law.
State ex rel. Moore v. Molpus, 578 So.2d 624, 632 (Miss. 1991).
In an action between state legislators and the Governor, this Court has addressed the usurpation of executive authority by the legislative branch in Alexander v. State By and Through Allain, 441 So.2d 1329 (Miss. 1983). We stated:
The executive, legislative and judicial departments of the state all serve the same constituency and are, of course, subject to and bound by the terms of the same state constitution. The interpretation of the constitution becomes the duty of the judicial department when the meaning of that supreme document is put in issue.
Id. at 1333.
In the case sub judice, Bryan, Endris and Horhn, as legislators and taxpayers, had standing to bring suit since they asserted a colorable interest in the litigation. Individual legislators had standing to bring the instant action under well established case law. See Van Slyke v. Board of Trustees, 613 So.2d 872, 875 (Miss. 1993); Board of Trustees v. Van Slyke, 510 So.2d 490 (Miss. 1987); Dye v. Hale, 507 So.2d 332 (Miss. 1987); See State ex rel. Moore v. Molpus, 578 So.2d 624 (Miss. 1991). Their votes on these bills were adversely affected by the Governor's vetoes. The Attorney General had standing in his official capacity to intervene in this suit on behalf of the State. See State ex rel. Moore v. Molpus, 578 So.2d at 632.

V.

CONCLUSION
The issues herein are of considerable constitutional importance to the executive and legislative branches of government, as well as to all citizens and taxpayers of Mississippi.
This Court, as the third branch, recognizes that the other two branches, both strong and *1004 independently minded, were and are motivated by the best of intentions and good faith as each performs necessary acts of governance.
For those necessary acts of governance to continue, disputes involving separation of powers must be resolved as they arise, and the resolution of this particular dispute is consistent with sound jurisprudence and the established law of this State.
Mindful of the quote from Holder, supra, on the first page of this opinion, and cognizant that now unknown disputes of governance shall, undoubtedly, present themselves for future resolution, the Court notes that our government endures within a framework of constitutionally balanced separation of powers, but permits and encourages aggressive, but lawful, interaction amongst its branches.
AFFIRMED.
SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
HAWKINS, C.J., concurs in part and dissents in part with separate written opinion joined by PRATHER, P.J., and in part by DAN M. LEE, P.J., and SMITH, J.
DAN M. LEE, P.J., concurs in part and dissents in part with separate written opinion joined in part by SMITH, J.
McRAE, J., concurs with separate written opinion.
SMITH, J., dissents with separate written opinion joined in part by DAN M. LEE, P.J.
HAWKINS, Chief Justice, concurring in part and dissenting in part:
I concur in the majority's opinion affirming the summary judgment finding the Governor's attempt to partially veto House Bills 1613 and 1502 a nullity. I would have hoped the majority would have ended the matter there.
The summary judgment also held that the Governor's attempt to amend 27 appropriation bills was a nullity. In his brief on appeal, the Governor made no attempt to challenge the correctness or validity of the judgment holding he had no such authority. This is a clear acknowledgement by the appellant that the chancellor was correct in his decision. This should end the matter insofar as this issue is concerned, and there is no occasion, warrant, necessity or authority to write an opinion as to which there is no controversy.
There are compelling reasons based upon centuries of experience why appellate courts only address those issues necessary to decide the case before them. First, that is the limit of their legitimate authority; they have no authority to make pronouncements of law outside the issues actually presented for decision. Second, their time is precious and scarce, and must be carefully husbanded to take care of the needs of hundreds of litigants seeking to be heard. This is especially true with this Court.
The majority's citation of Strong v. Bostick, 420 So.2d 1356 (Miss. 1982), its authority  and incidentally its only authority to support its position  is incongruous. In Strong both sides had submitted briefs, and the issue was controverted on appeal when the appellees, who had won in the lower court, sought to dismiss the case as moot. Had this Court sustained the motion to dismiss, the appellees would have won. Here we have the loser making no issue whatever in his brief that the chancellor erred in that part of the decree finding the Governor had no authority to amend the 27 appropriation bills.[1]
The majority does concede a difference between the appeal posture in Strong and here, but somehow find the 180-degree variance between the two a distinction without a difference. Majority Opinion, at pp. 1001-02.
There is a vast difference between an appellee who has won in the lower court seeking a dismissal of the appeal because of mootness and a losing appellant. The former thereby wins his case, and is free to continue conduct which won approval in the trial court. But, the appellant who has lost has had his conduct condemned; there is a lawful *1005 judgment or decree against him, and I find it difficult to grasp that any responsible individual will repeat conduct condemned by a judgment from which he took no appeal. It is an amazing denigration of the authority of a chancery court for this Court to pronounce that a citizen may feel free to ignore its decree. (Yet somehow pay attention to us!) Majority Opinion, at p. 1001. The courts of this State are not precatory jawboners.
Our decisions are legion that this Court does not address issues not raised by the appellant in his brief. Greenlee v. Mitchell, 607 So.2d 97 (Miss. 1992); R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017 (Miss. 1990); Wood v. Gulf States Capital Corp., 217 So.2d 257 (Miss. 1968); Richardson v. Stokes, 254 Miss. 71, 180 So.2d 153 (1965); Chrismond v. Chrismond, 213 Miss. 189, 56 So.2d 482 (1952); E.L. Bruce Co. v. Brogan, 175 Miss. 208, 166 So. 350 (1936). Why the change here? Suppose the Governor, having lost in the chancery court, had simply chosen not to appeal? Would we have gone ahead and decided the case on appeal, anyway? Or suppose, having perfected his appeal, he had simply moved to dismiss it entirely, or failed to pursue it? Would we have gone ahead and addressed the issues, anyway? I was always of the impression that an appellant could at any stage acknowledge the correctness of the lower court by brief or motion, or failure to complain in his brief. Such concession has invariably been followed by a sigh of relief by opposing counsel (and also by this Court) for being relieved of time-consuming research and writing, not by an insistence by opposing counsel that we go ahead and address it, anyway.
Even more serious, which the majority also ignores, is the almost sacrosanct principle that no Constitutional question is addressed unless necessary for a decision in the case. Tribou v. Gunn, 410 So.2d 378 (Miss. 1982); Dixie Electric Power Ass'n v. Hosey, 208 So.2d 751 (Miss. 1968); Broadhead v. Monaghan, 238 Miss. 239, 117 So.2d 881 (1960).
The hallmark of any Supreme Court should be restraint. Moreover, the majority's addressing this issue is doubly unfortunate because we are taking the highest official in the Executive Branch to task for exceeding his lawful authority, and yet we blatantly breach the appropriate bounds of an appellate decision. This makes the majority's preamble quote from State v. Holder, 76 Miss. 158, 23 So. 643 (1898), of rather dubious sincerity.
In short, the Governor did not address the matter of the 27 appropriation bills in his brief, and neither should we.
PRATHER, P.J., joins this opinion.
DAN M. LEE, P.J., and SMITH, J., join in part.
DAN M. LEE, Presiding Justice, concurring in part, and dissenting in part:
I concur with the majority's conclusion that attempts by Governor Fordice to partially veto House Bills 1613 and 1502 by substituting his figures for those of the Legislature were unconstitutional acts, and therefore, a nullity. The Governor's acts were unconstitutional because of the manner in which he exercised his partial veto, not because the bills were labeled as "revenue bills." Since form should not rule substance, I cannot agree that House Bills 1613 and 1502 did not appropriate funds merely because those bills also raise revenue.
Also, I agree with that part of Chief Justice Hawkins' separate opinion which finds that review of the twenty-seven other bills by this Court is unnecessary. The Governor did not brief the issues involving those bills, and he accepted the chancellor's decision regarding those twenty-seven bills as a binding final decision.

I.
The case sub judice requires consideration of several constitutional provisions. The relevant provisions of Article 4 of the Mississippi Constitution of 1890, which are pertinent to analysis and discussion, are as follows:
Section 63. No appropriation bill shall be passed by the legislature which does not fix definitely the maximum sum thereby authorized to be drawn from the treasury.
Section 64. No bill passed after the adoption of this Constitution to make appropriations *1006 of money out of the state treasury shall continue in force more than two months after the expiration of the fiscal year ending after the meeting of the legislature at its next regular session... .
....
Section 72. Every bill which shall pass both Houses shall be presented to the Governor of the state. If he approve, he shall sign it; but if he does not approve, he shall return it, with his objections, to the House in which it originated....
Section 73. The governor may veto parts of any appropriation bill, and approve parts of the same, and the portions approved shall be law.
In interpreting and construing our Constitution, we should be ever mindful of the wisdom of past jurists. As expressed by Judge Learned Hand:
There is no more likely way to misapprehend the meaning of language  be it in a constitution, a statute, a will or a contract  then to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis' maw that one is in danger of being impaled upon Scylla's rocks.
Central Hanover Bank & Trust Co. v. Commissioner, 159 F.2d 167, 169 (2d Cir.1947).

II.
The appellees contend that the title of House Bills 1613 and 1502, as bond bills (revenue bills), should be indicative of the purpose and effect of those bills. However, simply labeling House Bills 1613 and 1502 solely as "revenue bills" does not eradicate language from those bills which does, in fact, appropriate money for special projects. The title of a bill is not conclusive, but merely advisory in nature, and may be misleading. See Roseberry v. Norsworthy, 135 Miss. 845, 100 So. 514 (1924). It is not decisive whether the Legislature voted on those bills as "revenue bills" or as "appropriation bills." Legislative intent cannot be gleaned from the nature of such a vote on House Bills 1613 and 1502. Since those bills are hybrids, achieving the raising of revenue and appropriations for special projects, voting on the bills as either "revenue bills" or "appropriation bills" would not displace the actual effect of the bills, whether it be for raising revenue, appropriating funds, or both.
It does little justice to obtusely focus only upon the language of House Bills 1613 and 1502 which authorize the raising of revenue for projects, while simultaneously ignoring the remaining language of those bills. The draftsman of House Bills 1613 and 1502 did not limit the elements or effects of those bills to the parameters set forth in Miss. Const. art. 4, §§ 63, 64 and 69. The language of those two bills does more than appropriate, but that does not mean that those bills did not have contemplated appropriative effect. An examination of House Bills 1613 and 1502 leaves little doubt that those bills were intended to accomplish two tasks, both to raise revenue and appropriate those revenues for expenditure to offset the costs of special projects.[1]
Whether a singular legislative bill may constitutionally appropriate funds under the umbrella of a "revenue bill" is not the question addressed by the majority in this case, and I, therefore, do not endeavor to express my views on that subject. But, if hybrid bills such as House Bills 1613 and 1502 are not constitutionally infirm, then the Governor may veto parts of those bills which have appropriative effect, provided he do so properly. However, the Governor's attempt at partial veto was not proper in this instance, and is, therefore, a nullity. See State v. Holder, 76 Miss. 158, 23 So. 643 (1898).

III.
"It [Section 73] applies to such as are made up of parts and consists of portions *1007 separable from each other as appropriations." Id., 23 So. at 644. The dispositive question, in determining applicability of the Governor's § 73 veto power, should not be whether House Bills 1613 and 1502 are solely appropriations bills or solely revenue bills. Instead, the analysis centers on whether the bills do, in fact, appropriate, regardless of whether they accomplish other tasks or go beyond the parameters of §§ 63, 64 and 69. "Every bill of the character in question has three essential parts: The purpose of the bill, the sum appropriated for the purpose, and the conditions upon which the appropriation shall become available." Id., 23 So. at 645.
The two bills under consideration plainly satisfy the Holder criteria. Each bill: 1) states the purpose of the funds appropriated and to be expended; 2) states the maximum amount appropriated and to be expended for each project; and 3) conditions the availability and expenditure of the appropriated funds upon the issuance of warrants.
Nevertheless, the appellees contend that, because House Bills 1613 and 1502 raise revenue and create debt to be repaid by an uncertain amount in the future, House Bills 1613 and 1502 cannot also appropriate funds. But, instead of drafting a bill which is exclusively a revenue bill or exclusively an appropriation bill, the architect of House Bills 1613 and 1502 wandered astray and incorporated the purpose and effect of both revenue raising and appropriations into those two bills.
Neither our Constitution, our statutes nor our cases define an "appropriation bill," however, the New Jersey Supreme Court provides a helpful definition, as follows: "An appropriation is an authorization, statutorily enacted by the Legislature, for the withdrawal of monies from the State treasury for governmental purposes." Karcher v. Kean, 97 N.J. 483, 479 A.2d 403, 407 (1984). Other jurisdictions have held similarly:
It is well settled that no special form of language is required to make an appropriation. If it be the intent of the appropriating body that the money in question be paid, it makes no difference in what terms such intent is expressed.
Crawford v. Hunt, 41 Ariz. 229, 17 P.2d 802, 804 (1932). Accord, People v. Goodykoontz, 22 Colo. 507, 45 P. 414, 415 (1896) (no set form of words are required in order to constitute an appropriation, so long as it is clear that intent to appropriate funds is present); Campbell v. Commissioners, 115 Ind. 591, 18 N.E. 33, 34 (1888) (an appropriation may be made even in the absence of a formal declaration as such).
House Bill 1613 listed expenditures for numerous projects, but set a maximum amount to be spent on those selected projects at $65,882,979.00, stating that such funds "shall be disbursed, in the discretion of the Department of Finance and Administration, to pay the costs of capital improvements, renovation and/or repair of existing facilities, furnishing and/or equipping facilities of state institutions of higher learning and community and junior colleges, and purchasing real property for public facilities for the Board of Trustees of State Institutions of Higher Learning. ..." (emphasis added). Likewise, House Bill 1502 allocated a total of $8,000,000.00 to be spent in various amounts on fourteen different projects, stating that the funds "shall be allocated and disbursed, through the Department of Finance and Administration, based upon the recommendations of the Board of Trustees of the Department of Archives and History, to pay the costs associated with each project. ..." (emphasis added).
House Bills 1613 and 1502 clearly appropriate. "Section 73 of the constitution relates to general appropriation bills, or those containing several items of distinct appropriations. ..." State v. Holder, 76 Miss. 158, 180, 23 So. 643, 644 (1898) (emphasis added). A fortiori, the Governor's partial veto power derived from Miss. Const. art. 4, § 73, is applicable to all bills which have appropriative effect, not just those bills which are labeled as "appropriation bills."
Furthermore, the requirements of Miss. Const. art. 4, § 63 were met by both bills. But, instead of recognizing the stated maximum amounts of the appropriation portions of House Bills 1613 and 1502, the majority contends that unknown interest rates and dates of maturity on the bonds authorized by *1008 the revenue raising portions of those bills prevent satisfaction of the § 63 requirement of a fixed maximum sum authorized to be drawn from the treasury. That contention simply avoids confronting the issue.
The § 64 requirement is more troublesome, however. House Bills 1613 and 1502 do not expressly prohibit the Department of Finance and Administration from expending appropriated funds after the expiration of the time parameters established by § 64. Nevertheless, that issue is not on appeal to this Court, and is not decided this day. Accordingly, the majority does not decide whether a bill which does not facially conform with § 64 would expire or be ineffective beyond "two months after the expiration of the fiscal year ending after the meeting of the Legislature at its next regular session," or, alternatively, void from its inception. If such bills simply expire after the requisite § 64 time period, then House Bills 1613 and 1502 satisfy § 64 until "two months after the expiration of the fiscal year ending after the meeting of the Legislature at its next regular session." However, if House Bills 1613 and 1502 abrogate the § 64 time requirement, so as to frustrate the constitutional purpose of that section, then the language which appropriates funds for special projects and authorizes the Department of Finance and Administration to expend those funds on a continuing basis would cause those bills to be constitutionally infirm. But, this Court, today, does not squarely address the constitutionality of House Bills 1613 and 1502.
Quite simply, the Legislature, in House Bills 1613 and 1502, mandated and authorized the expenditure of $65,882,979.00 and $8,000,000.00, respectively, by the Department of Finance and Administration, and no future appropriation bill or further action by the Legislature was required for the Department of Finance and Administration to spend the designated amounts of the monies of the taxpayers and citizens of Mississippi. But, without such legislative action, the Department of Finance and Administration would not have authority to make the expenditures for the enumerated special projects. Assuming that House Bills 1613 and 1502 are not unconstitutional, the foregoing is a definition of legislative action embodied within a bill which appropriates. Therefore, House Bills 1613 and 1502 appropriated, and were subject to the Governor's § 73 partial veto power.

IV.
Here, House Bill 1613 began as a bill that authorized the issuance of general obligation bonds of the State of Mississippi in the amount of $2,000,000.00, and appropriated the funds derived from the sale of those bonds for the purpose of repairing storm damage to the Mississippi University for Women campus caused by a tornado. After numerous amendments, the final version of House Bill 1613 that was enacted by the Legislature had grown tremendously, and was sent to the Governor for his approval or veto. It authorized the issuance of bonds in the amount of $65,882,979.00, and appropriated the funds to be derived from the sale of those bonds for expenditures on individual projects at all Mississippi universities and community or junior colleges, such individual project costs totalling $65,882,979.00.
House Bill 1502 experienced similar growth through the legislative amendment process. It began as a bill to authorize the issuance of $5,350,000.00 in bonds, and which appropriated the proceeds from the sale of those bonds for the acquisition, development, improvement or renovation of eight sites of historical significance throughout Mississippi. As finally enacted by the Legislature and sent to the Governor, the bill provided authorization for the issuance of $8,000,000.00 in bonds, and the proceeds of the sale of those bonds were appropriated for thirteen historical sites, in additional to twenty-five more historic sites which were deemed eligible for funding.

V.
A fair reading of Mississippi's Constitution yields the conclusion that the drafters of our Constitution obviously intended that a system of checks and balances exist between the power of the Legislature to determine what amounts of the citizens' funds should be appropriated and spent from the state treasury, and the power of the Governor to disapprove *1009 of certain expenditures by partial veto. The Legislature should not be allowed to subvert the Governor's constitutional § 73 veto power by filling a bill with language that has appropriative effect, but which also adds elements that would defeat the definition of a wholly exclusive appropriation bill. If a portion of a bill, in fact, appropriates, that portion of the bill is subject to the Governor's § 73 partial veto power, regardless of the label placed upon the bill. Otherwise, the Governor would be forced to veto the entire bill, perhaps stalling proper funding of projects which he and the Legislature agree upon, merely because the projects are included in a hybrid bill.
Miss. Const. art. 4, § 73 serves as a safeguard against mushrooming omnibus legislative bills by empowering the Governor with partial veto power. We have previously recognized the purpose and legitimacy of § 73, stating that:
Section 73 was framed with a view of guarding against the evils of omnibus appropriation bills securing unrighteous support from diverse interests, and to enable the governor to approve and make law some appropriations, and to put others to the test of securing a two-thirds vote of the legislature as the condition of becoming law. Thus viewed, section 73 is eminently wise, and will prove useful in practice, as corrective of an evil... .
State v. Holder, 76 Miss. 158, 180, 23 So. 643, 644 (1898).
Instead of vetoing House Bills 1613 and 1502 in their entirety by utilizing his § 72 veto power, the Governor attempted to use his § 73 partial veto power, vetoing certain projects but approving others. The Governor attempted to limit the expenditures of House Bill 1613 to a total expenditure of $8,306,979.00. Likewise, he attempted to reduce House Bill 1502 to a total expenditure of $5,150,000.00.
However, the Governor's attempts were constitutionally flawed. While the Governor may properly veto separate "parts" of any language in a legislative bill which has as its purpose the "appropriation" of funds, he may not legislate by substituting his own figures for those of the Legislature. Here, the Governor transgressed into the realm of legislating by making such substitutions in House Bills 1613 and 1502.
According, I concur that the Governor did not properly exercise his § 73 partial veto power, as it concerns House Bills 1613 and 1502. However, § 73 is applicable to all omnibus appropriative bills of the Legislature.
SMITH, J., joins in part in this opinion.

*1010 APPENDIX A

*1011 
*1012 
*1013 
*1014 
*1015 
*1016 
*1017 
*1018 
*1019 
*1020 
*1021 
*1022 
*1023 
*1024 

*1025 APPENDIX B

*1026 
*1027 
*1028 
*1029 
*1030 
*1031 
*1032 
*1033 
*1034 
*1035 
*1036 
*1037 
*1038 
*1039 
*1040 
*1041 
*1042 
*1043 
*1044 
*1045 
*1046 McRAE, Justice, concurring:
For almost one hundred years, no other governor has ever shown such contempt for the other two branches of government as Governor Fordice. I agree with the majority opinion which holds that the manner in which this great State's Governor used his veto power under Article IV, Section 73 of the Mississippi Constitution of 1890 was by no stretch of the imagination proper or decorous. Governor Fordice is given the authority to veto legislation. He, however, cannot amend legislation nor can he write legislation. In this case, he has deducted more than $65 million in funds authorized by the legislature. If he has the authority to take such action, then he also has the authority to increase legislative authorizations. If he had decided to augment the authorized funds in this case by $100 million, everyone would have been up in arms! This he cannot do.
In the ninety-six years since our decision in State v. Holder, 76 Miss. 158, 23 So. 643 (1898), no governor has attempted to legislate. Further, Governor Fordice's attempt to invade the third branch of government, the judicial branch, by arguing that he is immune from judicial review when exercising his veto power reveals his indifference to this Court. The issues presented to this Court clearly are grounded in public interest, and the breadth of the importance of this issue is more than apparent. Governor Fordice's actions and arguments surrounding these twenty-nine bills in question expose his disdain for the legislative and judicial branches of Mississippi government. Accordingly, I concur with the majority in holding that Governor Fordice's actions were unconstitutional.
It is imperative that at least one distinction between an appropriation bill and a revenue bill be noted. The Legislature requires that an appropriation bill pass by a majority vote while a revenue bill compels a two-thirds vote for passage. As early as 1938, this Court stated that a majority vote is needed for an appropriation bill to pass. Tatum v. Wheeless, 180 Miss. 800, 178 So. 95 (1938). This State's Constitution does not define an appropriation bill, nor does any state statute. That being the case, the sole fitting entity that can define what constitutes an appropriation bill is the Legislature. That is not to say, however, that this Court cannot construe the Legislature's interpretation of a bill if it is in violation of our Constitution. This Court is always vested with that authority. But for the Governor to declare a certain bill an appropriation bill is an evasion of the legislative power and authority. If each Governor of Mississippi could form his own definition of an appropriation bill as he so desired in order to employ his line item veto power, then the Legislature would never know how many votes were needed for the passage of a particular bill. If such were the case, the total votes required for a bill to pass would be a moving target, susceptible to the Governor's whim.
Governor Fordice is authorized, pursuant to Article IV, Section 73 of the Mississippi Constitution of 1890, to veto parts of an appropriation bill; however, this Court finds that House Bills 1613 and 1502 were not appropriation bills. The precedent, since 1890, has been clear. A bill which authorizes the issuance of bonds to be paid over a period of time with an interest to be calculated on the remaining balance has never before been deemed an appropriation bill. We have stated that an appropriation bill is "a fund for the general purposes of running the state government, or providing for the expense of operating the state government." Tatum, 180 Miss. 800, 178 So. at 102. In Tatum, we determined that monies appropriated for unemployment benefits could not be deemed an appropriation bill since the monies did not go into the general fund for operating expenses. It is a very simple concept to comprehend; anything that does not go into the general fund that operates our government cannot be an appropriation bill. In the case at hand, the monies from the bond bills did not go into the general fund; therefore, in no way, can it be an appropriation bill.
Although the Mississippi Constitution of 1890 does not explicitly define an appropriation bill, it does mandate that an appropriation bill loses its validity if it is not paid within two months after the "expiration of the fiscal year ending after the meeting of the legislature at its next regular session ..." Article 4, Section 64 of the Mississippi *1047 Constitution of 1890. If a particular bill is not designated as an appropriation bill but in fact is an appropriation bill, it loses its validity if not paid at the end of the fiscal year after the Legislature adjourns; therefore, an appropriation bill must be designated as such. And as stated previously, who better else to designate a bill as an appropriation bill than the Legislature who knows the true intention of the bill? If the governor is allowed to ignore Mississippi's Constitution of 1890 and the Legislature's interpretation of what is an appropriation or a revenue bill, then our system of government fails. The Legislators adopted joint rules for the Senate and House of Representatives which set forth their operating procedures. Rule 18 of the Joint Rules of the Senate and House defines a revenue bill and states that a three-fifths votes is required for passage:
All general bill providing for the levying of taxes, borrowing of money, issuing bonds, notes, or other evidence of debt, providing for fees or imposing the issuance of licenses, of whatever kind by the state or any subdivisions thereof, or the exemption of property from state or any subdivisions thereof, or the repeal or amendment of any revenue bill or measure shall be considered as revenue bills, and no revenue bills, or conference committee report thereon, or concurrence in amendments adopted by the other House shall be passed or adopted by either the Senate or the House except by a vote of at least three-fifths of the members of the Senate and House, respectively, present and voting.
Governor Fordice knew at the time he was legislating that, pursuant to Rule 18, the bill in question was definitely a revenue bill. Instead, he clearly ignored the Legislature's definition of a revenue bill and made his own contrary interpretation. This he could not or cannot do.
It is argued in Chief Justice Hawkins' opinion, with Presiding Justice Lee agreeing, that this Court's review of the other twenty-seven appropriation bills passed by the 1993 Legislative Session is not necessary since the Governor did not contest the matter on appeal. To the contrary, if we did not consider this subject matter at this time, the Governor, on an annual basis, could strike, change, amend or rewrite any so-called appropriation bill. And if any legislator brought the matter before a court of competent jurisdiction, the Governor could simply announce that he was not appealing that portion of the lower court's ruling. Such gambit would yield a continuous battle with neither this Court nor the Legislature having a solution to the ever arising, existing problem. See Supreme Court Rule 28(a)(3) ("No issue not distinctly identified shall be argued by counsel, except upon request of the Court, but the Court may, at its option, notice a plain error not identified or distinctly specified.") (emphasis added).
Perhaps, if Governor Fordice desires to write law or to offer amendments to proposed laws, then he should hang up his spurs as Governor and run for a position in the Legislature.
SMITH, Justice, dissenting:
I write to note my disagreement with the majority's decision in all respects. In so doing, I would first express my concurrence with that portion of Chief Justice Hawkins' well reasoned concurring in part, dissenting in part opinion, that the attempted amendment of the 27 appropriation bills was an issue that should not have been decided by this Court, as it was not argued on appeal by the Governor. I am also in agreement with that part of Justice Dan Lee's detailed concurring in part, dissenting in part, opinion finding that House Bills 1613 and 1502, by their clear intent to appropriate monies from the State Treasury, constituted both revenue and appropriation bills.
Having agreed with Justice Lee's analysis and resulting conclusion that House Bills 1613 and 1502 are appropriation bills at least in part, they are thus subject to the Governor's partial veto authority set forth in Miss. Const. art. 4, § 73.
Beginning my analysis from this point, I would write to further express my opinion that as a result of the Governor properly exercising his § 73 partial veto authority, the two bills became law not in their original form, but with those items properly vetoed being deleted and their corresponding *1048 amounts subtracted from the totals originally allocated by the Legislature. Further, regarding the single item which the Governor improperly attempted to veto, by his act of crossing through the Legislature's stated allocation and substituting a lower figure of his own, as a nullity, accordingly became law as if such action had not been taken.
Decisions of this Court, including Holder, relied upon by the majority to reject the Governor's authority to exercise his veto authority are not particularly helpful to this case. However, other jurisdictions which have considered a governor's authority to veto and to partially veto legislation offer guidance.
The case of State Ex. Rel. Wisconsin Teleph. Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935) is particularly instructive. Therein, the Legislature passed Bill 48A,  "An Act to raise revenues for emergency relief purposes, and making appropriations." Id., 260 N.W. at 489. Bill 48A thus was on its face a hybrid bill, both revenue-raising and appropriationary, in the nature of House Bills 1613 and 1502 here under consideration. Interestingly, Bill 48A was drafted with an eye toward raising and spending funds "which were absolutely necessary for immediate emergency relief," just as House Bill 1613 had its inception in repairing severe storm damages to MUW. Id. Returning to the Wisconsin case, upon presentation of Bill 48A to that state's governor, he approved parts, vetoed others and returned the bill with his objections to the state's Assembly. The plaintiff sued, contending the grant of authority to the Governor allowing him to approve or disapprove different parts of an appropriation bill did not also allow him to veto "a proviso or condition inseparably connected to the appropriation, nor to disapprove parts of an appropriation bill that are not an appropriation." Id. at 490.
In a well-reasoned opinion, the Wisconsin Supreme Court first determined it was not necessary to address the issue of the effect of an attempted veto of provisos or conditions "inseparably connected to the appropriation":
[U]pon analyzing the terms of the bill in question, we have concluded, for reasons hereinafter stated, that the parts which were disapproved by the Governor were not provisos or conditions which were inseparably connected to the appropriation. If they had been, the decision in State ex rel. Teachers & Officers v. Holder, 76 Miss. 158, 23 So. 643, would afford support for the plaintiff's contention.
260 N.W. at 490.
The constitutional grant giving the Wisconsin governor the authority to effect a partial veto is found in section 10, article 5 of that state's constitution which reads, in part:
Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law... .
Having found the bill at issue to contain distinct, severable parts, the Wisconsin Court determined the Governor could properly exercise his partial veto authority:
It may well be that section 10, art. 5, Wis. Const., was not intended to empower the Governor, in vetoing parts of an appropriation bill, to dissever or dismember a single piece of legislation which is not severable, or so as to leave merely provisions which are not a complete or fitting subject for a separate enactment by the Legislature. Although that may not have been intended, there in nothing in that provision which warrants the inference or conclusion that the Governor's power of partial veto, was not intended to be as coextensive as the Legislature's power to join and enact separable pieces of legislation in an appropriation bill.
260 N.W. at 492.
The Wisconsin Court concluded:
It follows that, in approving those parts of the bill which now constitute chapter 15, Laws of 1935, and in disapproving the other parts of the bill which were not essential, integral, and interdependent parts of those which were approved, the Governor was acting entirely within his constitutional prerogative under section 10, art. 5., Wisc. Const. Therefore, upon the return of the parts vetoed by the Governor to the Assembly, and the refusal of two-thirds of the members thereof to pass those parts over the Governor's veto, only those portions of the bill which had *1049 been approved by the Governor constitute the legislative enactment, which it became the duty of the secretary of state to cause to be published. . ..
Id., 260 N.W. at 493.
Following the most logical analysis of the Wisconsin Court, this writer would submit that as concerning House Bills 1502 and 1613, those provisions or "parts" properly eliminated through the Governor's use of his partial veto authority, were not enacted into law, save the possibility that they be passed over the Governor's veto. The remaining parts of both bills, as approved and signed by the Governor, became law. This would include the single instance where the Governor improperly attempted to use a partial veto in Bill 1613, Line 57, where he substituted his own amended figure for that provided by the Legislature. See § 73  "The governor may veto parts of any appropriation bill, and approve parts of the same, and the portions approved shall be law."
Throughout both bills the Governor also crossed through the total amounts allocated and inserted a figure representing the amounts allocated after all vetoed items were deducted. Again, with the exception of line 57, Bill 1613, there was nothing improper in this action; it was mathematically logical for the Governor to note the total amounts allocated to reflect consistency with the totals for each item he properly approved. This was no different than, for example, the Governor inserting the figure "0" at each point in the bills where he vetoed a particular item.
There is further support for the conclusion that the invalid attempt to partially veto an item is ineffectual and results in the entire item being approved, even in State v. Holder, cited as the majority's primary support. Therein, the Court considered the Governor's attempt to exercise his partial veto under § 73 to be void, the bill in question "not being an appropriation bill within its meaning, and not being a veto of parts of distinct and separable appropriations." Id., 76 Miss. at 183, 23 So. 643. I would submit that neither reason applies to render the Governor's actions void in the case sub judice, the bill being both an appropriation bill and made up of clearly distinct and separable, and therefore severable, parts.
The Holder Court noted the "true meaning of section 73", as follows:
... [A]n appropriation bill made up of several parts  that is, distinct appropriations, different, separable, each complete without the others, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves  may be approved and become law in accordance with the legislative will, while others of like character may be disapproved and put before the legislature again, disassociated from the other appropriations.
76 Miss. at 181-82, 23 So. 643.
Contrary to the legislation considered in Holder, it is submitted that House Bills 1502 and 1613 are clearly the type of bills contemplated for use of the Governor's partial veto authority. That certain "parts" of the bills were vetoed, as that authority is expressly provided for in § 73, in no way affected those remaining parts which the Governor approved.
House Bill 1613, as it were, began as a measure designed to serve only a single purpose  to remedy damages caused by severe storms at the campus of Mississippi University for Women and a separate appropriation for Alcorn State University to continue its previously approved construction. It would appear obvious that these appropriations are completely separate and distinct from each other, but, more importantly, from the numerous remaining allocations of millions of additional dollars to be spent at twenty-five (25) other colleges, universities and campuses. The same result follows when Bill 1502 is considered; simply because appropriations for certain projects were not approved in no way affects those which the Governor did approve. Any other conclusion would severely limit the partial veto authority clearly given the Governor under § 73 and to which individual parts of these bills were validly subjected. The legislative history of the subject bills provides a classic example of what can be potentially wrong with omnibus appropriation bills and why Section 73 was *1050 enacted to allow partial veto by the Governor. The Holder Court appropriately stated:
Section 73 was framed with a view of guarding against the evils of omnibus appropriation bills, securing unrighteous support from diverse interests, and to enable the governor to approve and make law some appropriations, and to put others to the test of securing a two-thirds vote of the legislature as the condition of becoming law. Thus viewed, section 73 is eminently wise, and will prove useful in practice as corrective of an evil, but if a single bill, making one whole of its constituent parts, "fitly joined together," and all necessary in legislative contemplation, may be disevered by the governor, and thereby become law, while the other parts, unable to secure a two-thirds vote in both houses, will not be law, we shall have a condition of things never contemplated, and appalling in its possible consequences.
76 Miss. at 180-81, 23 So. at 644-45.
Finally, consistent with Holder, as to the single allocation improperly vetoed by Governor Fordice, where the Governor by attempted amendment, substituted his own figure for that allocated by the Legislature, his action was a nullity, as such action constituted writing legislation which is solely the Legislature's authority.
In conclusion, the fact that the Governor improperly attempted to exercise a partial veto at one point in House Bill 1613, a nullity, should have no effect on the parts of the bills validly approved. Similarly, the items properly vetoed in accordance with the Governor's § 73 partial veto power may become law only if returned to the Legislature in a timely manner and passed over the Governor's veto by a vote of two-thirds of the members.
Regardless, Governor Fordice has certainly not "invaded" the judicial branch by merely exercising his right under § 73 of the Mississippi Constitution to strike portions of the respective bills with which he disagreed, as claimed in the concurring opinion. Our founding fathers wisely created three, separate but equal branches of government, each delegated with certain responsibilities which often cause the occupants of the respective branches to disagree, and rightfully so in the interest of good government and what is best for the taxpaying citizens.
However, there is no need to express views toward Governor Fordice, or any sitting Governor for that matter, that because he exercises his partial veto authority under § 73 he is therefore expressing "indifference to this Court," or "disdain for the legislative and judicial branches." Such comments are uncalled for, unnecessary and serve no purpose whatsoever. Governor Fordice has the constitutional right to properly exercise a line item veto as well as a responsibility to do so if and when he deems it to be in the best fiscal interest of the taxpaying citizens of this state. That is a governor's perogative as chief executive officer of this state.
This writer has great respect for the separation of powers established by our constitution. Although there will be occasional disagreement on important governmental issues between the three separate branches, nevertheless, we should always when expressing our disagreement do so with courteous respect for the other branches of government.
For the reasons set forth above, I respectfully dissent.
DAN M. LEE, P.J., joins this opinion in part.
NOTES
[1] "Perhaps it goes without saying that normally on appeal the whole case is before the appellate tribunal, even though the appellant excepts to only a part of the judgment below. All the facts as developed by the pleadings and evidence are before the appellate court and it may and should exercise its independent judgment on the propriety of granting declaratory relief. And the appellate court has a free hand in granting such judgment as it considers proper, instead of reversing for some minor error." Greater Anchorage Area Borough v. City of Anchorage, 504 P.2d 1027, 1036 (Alaska 1972) (quoting E. Borchard, Declaratory Judgments 253-54 (2d ed. 1941)).
[1] Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350, 352 (1975), supports this dissent; there a moot case was dismissed. Also, the appellee sought dismissal.
[1] A copy of House Bill 1613 and 1502, as well as the accompanying return transmittal letters from the Governor, are attached as Appendix "A" and Appendix "B" to this opinion, respectively.